429 So.2d 111 (1983)
STATE of Louisiana
v.
Renee MORRIS.
Nos. 82-KA-0549, 82-KA-0570.
Supreme Court of Louisiana.
February 23, 1983.
*114 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Kay Kirkpatrick, John Sinquefield, Asst. Dist. Attys., for plaintiff-appellee.
Michele Fournet, Vincent Wilkins, Asst. Public Defenders, for defendant-appellant.
DENNIS, Justice.
Defendant, Renee Morris, was originally charged by indictment with the first degree murder of her infant son, Michael Morris. Pursuant to defendant's motion to quash, the trial court ordered that the indictment be amended to accuse her of second degree murder. After a trial, Morris was convicted of second degree murder by a jury and sentenced to life imprisonment at hard labor without benefit of probation or parole for forty-years. La.R.S. 14:30.1, as amended by Acts 1976, No. 657 § 2. On appeal, this court reversed the defendant's conviction and sentence because the state had not introduced any evidence that the homicide was committed during perpetration or attempted perpetration of a statutorily specified felony as required by law. State v. Morris, 397 So.2d 1237 (La.1981). The case was remanded, the indictment was again amended to charge the defendant with first degree murder, and she was tried on this charge on November 17-18, 1981. Defendant was convicted of manslaughter, adjudicated a third felony offender, and sentenced to a term of forty-two years at hard labor. Defendant appealed and filed twenty-three assignments of error. In this court, she briefed and argued nine of the assignments, abandoning the remaining fourteen. We affirm her conviction of manslaughter, adjudication as an habitual offender and her sentence.

FACTS
On the afternoon of August 17, 1977, the defendant telephoned her husband, Dennis Morris, at the service station where he was employed and told him that something was wrong with their son. Dennis Morris left his job, and returned home to find his wife in hysteria and their child lying in his crib semi-conscious, with the child's eyes rolling back in his head, and blood running from his mouth. With the assistance of a state trooper, Dennis Morris took the child to Earl K. Long Hospital.
Dr. Kent Allen Robertson and Nurse Frances Vallenti attempted to treat the child. They found that the infant had extensive bruises about his face, head and upper torso. Some of the bruises had a yellowish hue, an indication they were two to three days old. Of most immediate concern, however, was a large fresh bruise on the back of the head, shallow respiration, and decerebrate posturing, all indications of severe brain damage. Since Earl K. Long Hospital was ill-equipped to handle neurological problems of this dimension, the infant was transferred to Our Lady of the Lake Hospital. He was placed in intensive care, and died a few hours later.
An autopsy was conducted by Dr. Jack Holden, a pediatrician and pathologist, and attended by Dr. Larry Hebert, an expert in the Battered Child Syndrome. Dr. Holden found that the cause of death was a massive skull fracture. Both doctors were of the opinion that the fracture was caused by massive trauma to the head. Because of the presence of other bruises about the body, in various stages of healing, and an absence of a prior accident history, they concluded that the child had been beaten to death. Dr. Hebert stated that it was a classic case of the Battered Child Syndrome. Dr. Robertson and Nurse Vallenti had earlier arrived at the same conclusion. Vallenti had worked with the local child protection center.
Mr. Morris stated that he had last seen his son the evening before. At that time, the child was perfectly healthy. At various times, Dennis Morris had gotten into bitter arguments with his wife over the disciplining of the child. Mrs. Morris had demanded that the discipline be left to her, and she held high expectations of the child's maturation and growth.
Mrs. Morris told her husband and Dr. Robertson that the child had fallen from his *115 high chair the morning before he was taken to the hospital. Drs. Robertson, Holden and Hebert all ruled out the possibility that the 6-8 inch massive bruise to the back of the infant's head could have come from a fall. The severity and size of the trauma indicated that a blunt instrument had been used to inflict the wound, and each viewed a picture of the high chair and stated that the wound could not have occurred in a fall from it.
At the hospital, Mrs. Morris asked Martha Wyly, a social caseworker from the child protection center, if she thought the police would believe that the child had fallen from a high chair. Before the police had informed Mrs. Morris of their suspicion that she had beaten her child, she requested of Michael Jastram, a plain-clothed officer for the local police, if they could hold off her arrest until after the child's funeral. Leslie Cordasco, the head ward clerk at the hospital, stated that Mrs. Morris exclaimed to her "Oh Lord, I have done it again. Tell me he is not dead too."
After Mr. and Mrs. Morris were questioned at the hospital by the police, Mrs. Morris was arrested for cruelty to a juvenile. La.R.S. 14:93. When the child died, the charge was changed to first degree murder. La.R.S. 14:30 (prior to amendment by 1979 Acts, No. 74 § 1).
Jastram stated that a consensual search of the Morris' apartment revealed traces of blood on the carpet and a wash cloth. He also found bruises on Mrs. Morris' hand. But, Leola Koppe stated that she saw Mrs. Morris injure her hand when she fell down some stairs and crashed through the glass of a fire extinguisher, and Jeanette Prestridge, a nurse, testified that she had drawn blood from Mrs. Morris' hand, and that as a result of that, bruising might occur.
Susan Green, a neighbor of Mrs. Morris', Leola Koppe, an acquaintance, Lauren Pranter, Mrs. Morris' babysitter, Mary Lou Pranter, Lauren's mother, and Vickie McCarter, a Red Cross co-volunteer with Mrs. Morris, all testified that at various times they had observed many bruises on Michael Morris' body. These bruises were explained to each of these people by Mrs. Morris as the product of the child falling down often. Mrs. McCarter testified that on one occasion, a zoo trip and pool party with many neighborhood children, Mrs. Morris seemed obsessively nervous and worried about her son getting dirtyeven to the point that she unclothed the baby for him to eat a cup-cake, stating that it would be easier to hose down the boy than to wash his clothes. Susan Green testified that, on one occasion, she saw Mrs. Morris slap the boy with such intensity that the incident drew the attention of everyone standing nearby.

Assignment of Error Number One
In this assignment of error, the defendant complains of the trial judge's refusal to grant a motion to quash her indictment. She contends that the Double Jeopardy Clause as interpreted in Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) prevents her retrial. This contention was raised by the defendant and disposed of by this court when it remanded this case for a new trial after her first conviction was reversed. In our opinion we stated:
In Burks the prosecution sought permission to retry the defendant after having had one full, fair and complete opportunity to prove him guilty beyond a reasonable doubt. See Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). In a situation such as the present case, where the state, acting in good faith, was erroneously required by defendant's motion and the trial court's order to amend a proper indictment under which it could have presented evidence of each essential crime element, and where the court and both parties were misled as to the applicable definition of second degree murder, we do not believe the Burks rule prohibits a second trial in which the prosecution will be afforded an opportunity to present its case based on a proper indictment. Unlike the reversal of Burks' conviction, our decision `does not constitute a decision to the effect that the *116 government has failed to prove its case. As such, it implied nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect....' Burks v. United States, supra [437 U.S. 1], 98 S.Ct. 2141, 2147 [57 L.Ed.2d 1]. The Double Jeopardy Clause, according to the Burks court, forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding. Burks v. United States, supra, 98 S.Ct. at 2147. In the present case, the prosecution does not seek to supply evidence which it failed to muster; it seeks to present the same evidence under a proper charge. The "failure of proof" in this case was attributable to an erroneous ruling by the trial court, despite the state's objection, that the indictment be amended, not to the state's failure to muster evidence under the proper indictment upon which it was prepared to proceed.
State v. Morris, 397 So.2d at 1252.
In this assignment, the defendant fails to urge any argument that convinces us our previous holding was incorrect.
According to the defendant, Burks holds that an accused can never be retried following an appellate ruling that the prosecution's evidence was insufficient the first time around. This is an oversimplification of the case and an overstatement of its holding. The application of the Burks' rule depends on why the prosecution's evidence was insufficient. See P. Western and R. Drubel, Toward a General Theory of Double Jeopardy, 1978 S.Ct.Rev. 81, 146 (1978). The evidence was insufficient in Burks because, despite the fullest opportunity to do, the prosecution simply failed to muster sufficient evidence to convict the first time around. In some cases, however, the evidence is insufficient because the trial judge wrongfully excludes a portion of the prosecution's case. Indeed, in Burks, the Court emphasized that its decision was limited to the situation in which "the prosecution cannot complain of prejudice [because] it has been given one fair opportunity to offer whatever proof it could assemble." Burks v. United States, supra, 437 U.S. at 16, 98 S.Ct. at 2149. Moreover, the Court noted that the prosecution was not contending that the trial judge had erroneously excluded evidence which, if admitted, would have cured the insufficiency. Burks v. United States, supra, 437 U.S. at 5, n. 4, 98 S.Ct. at 2144, n. 4. Thus, the most that can be said of the rule in Burks is that it precludes retrial following an unreversed ruling of insufficient evidence, where the prosecution has no valid excuse for not having presented sufficient evidence the first time around. Western and Drubel, supra. See also Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), discussed in Western and Dubel, supra, at 147, n. 292.
This assignment of error lacks merit.

Assignment of Error Number Ten
By this assignment of error, the defendant complains that the trial judge overruled her motion for a change of venue without considering the transcript of a previous voir dire which resulted in a mistrial. In the prior trial, held one month before the present one, a fair and impartial jury could not be selected. In the trial now under review, no testimony was taken on defendant's motion to change venue because she had no evidence to offer, other than several stories from a local newspaper, a transcript of a radio broadcast aired that morning, and the transcript of the previous voir dire. The state stipulated as to the accuracy of the newspaper accounts and the radio broadcast. The trial court deferred action on the motion until after voir dire when the jury was successfully empaneled. The judge denied the motion for change of venue, finding that the absence of any difficulty in selecting a jury rendered the issue moot. He also refused to allow the defendant to introduce the record of the prior jury voir dire, stating that the transcript was part of "another case." We disagree with some of the trial judge's reasons but think that he reached the right result under the circumstances.
*117 The mere fact that a jury was successfully empaneled does not render the venue question moot. Article 622 of the Code of Criminal Procedure clearly states that in deciding whether to grant a change of venue, "the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial." (emphasis added) The intention of the redactors in adding this provision was made clear by their commentary to the article:
The change of venue concept must be one which overrides the challenge for cause concept and is to be superimposed upon the entire proceedings. A change of venue ought to be available even though individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly. It is the purpose of the second paragraph of this article to effect such a policy ....
La.C.Cr.P. art. 622, Official Comment (b).
The standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. This does not mean, however, that the existence of any preconceived notion as to the guilt or innocence of an accused is sufficient to rebut the presumption of a prospective juror's impartiality. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975); Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642, 61 L.Ed.2d 751 (1961); State v. Goodson, 412 So.2d 1077 (La.1982).
At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights. Murphy v. Florida, supra. If the defendant can demonstrate the actual existence of a fixed opinion as to defendant's guilt, the individual juror may be excluded by a challenge for cause. Furthermore, if the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of jurors on the voir dire examination or the testimony of witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue. La.C.Cr.P. art. 622; State v. Goodson, supra; State v. Rodrigue, 409 So.2d 556 (La.1982).
Moreover, although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the "trial atmosphere" has been "utterly corrupted by press coverage." Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Murphy v. Florida, supra; State v. Goodson, supra.
The record does not justify a presumption that the defendant could not obtain a fair trial because of a trial atmosphere utterly corrupted by press coverage. The only publicity submitted to the court was the texts of six newspaper articles and one radio broadcast. The newspaper articles were all straightforward stories which simply reported the commencement of Morris' retrial and her unsuccessful attempt to obtain a continuance. The radio broadcast, which was aired the morning the jury selection began, simply stated, "Renee Morris' murder retrial is scheduled to begin today in district court. Morris is accused of first degree murder." In State v. Goodson, supra, we found that the introduction of thirty-five newspaper articles and one hundred and eight pages of transcripts of newscasts by local television stations publicizing the famed "Highland rapist" did not warrant a presumption of prejudice. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 *118 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and Rideau v. Louisiana, 373 U.S. 723, 82 S.Ct. 1417, 10 L.Ed.2d 663 (1963) for examples of press coverage justifying a presumption of prejudice.
The defendant failed to demonstrate actual prejudice, influence, or other reasons existing in the community which would affect the juror's answers on voir dire. Aside from the introduction of the news media reports, and a proffer voir dire of the previous mistrial, the defendant admits that there is no evidence in the record which would support such a finding. Our independent examination of the answers of the prospective jurors on voir dire examination in the trial under review lead us to the same conclusion. The juror's answers did not reflect actual community prejudice or any other reason which would prevent the selection of an impartial trial in the parish.
Of the forty-eight veniremen examined, five indicated that they had heard the radio broadcast. Of these five, three were not challenged for cause by the defendant. Two of these three were subsequently excused peremptorily, and one became a juror due to prior exhaustion of peremptory challenges by the defense. One of the five was excused on a joint challenge from both defendant and the state after she indicated that she would have difficulty remaining impartial because of the tender age of the victim. The last of the five was challenged for cause by the defendant, but the judge overruled the challenge because the venireman indicated that he could not remember any detail about the broadcast. This venireman was admitted to the jury due to prior exhaustion by the defendant of her peremptory challenges.
Four of the forty-eight prospective jurors indicated that they had read at least one of the newspaper accounts concerning the defendant. One of these four, a newspaper reporter for the State Times, was excused by joint challenge. Two of the four were challenged for cause by the defendant, which challenges were overruled. Of these two, one had indicated that he could not remember any details of the account. The other indicated that her difficulty with the case was not the newspaper account, but that she had previously worked with ex-offenders at a rehabilitation center. This juror was excused peremptorily by the defendant. The last of the group of four, the only one of the entire venire who indicated any knowledge that the case to be tried was a retrial of the defendant, was challenged by the state because of his remark that he thought the defendant had suffered enough.
The trial court was perhaps in error in refusing to transcribe and review the mistrial voir dire which was held approximately one month before the trial under review. However, counsel have informed us in brief and oral argument that a feature newspaper story on the morning of the trial was primarily responsible for their inability to select an impartial jury. The record before us demonstrates convincingly that by the time of the final voir dire, public and media attention were no longer focused on the case. Consequently, any error in failing to consider the previous voir dire was not prejudicial.
Under the circumstances presented here, the trial judge did not abuse his discretion in finding that an impartial jury had been empaneled or that local hostility toward the defendant would not prevent a fair trial. He did not commit reversible error in refusing to consider the transcript of the previous voir dire examination. See State v. Roberson, 159 La. 562, 105 So. 621 (1925). Cf. State v. Beavers, 394 So.2d 1218 (La. 1981); State v. Leichman, 286 So.2d 649 (La.1973).
Therefore, this assignment of error lacks merit.

Assignment of Error Number Eleven
By this assignment of error, the defendant complains of the voir dire procedure employed by the trial court. All forty-eight prospective jurors were called and seated in the first four rows of the courtroom. In groups of twelve as they sat, all forty-eight *119 veniremen were tendered to the attorneys for examination and challenges for cause. Following this, the remaining prospective jurors were tendered individually for acceptance or peremptory challenge as each name was called by random lot. This procedure continued until jury selection was completed.
The defendant argues that this method of jury selection denied her the right to a full voir dire examination. La. Const. art. I, § 17. In so large a group, the defendant argues, the individual characteristics of each venireman blend into a "sea of anonymous faces," making it impossible for the defendant to intelligently exercise peremptory challenges. With an impaired ability to observe the subtle nuances of body language, demeanor, and attitude, jury selection is reduced to the "rankest kind of guesswork." Additionally, the defendant argues that her right to exercise effectively challenges for cause was impaired by this procedure. Since each juror was called to the bench individually for a conference with the judge and attorneys when challenged for cause, the defendant argues that the remaining forty-seven veniremen became aware that the juror under examination had committed some transgression and thus received suggestions as to the responses they should give to questions.
We agree that examination of forty-eight veniremen en masse is cumbersome and deprives the defendant of fully effective voir dire. In State v. St. Amant, 413 So.2d 1312 (La.1981) (on rehearing), this court disapproved of an identical examination procedure involving a venire of thirty-six persons. By the time such an examination is completed and defense counsel is afforded an opportunity to exercise peremptory challenges, it is difficult, if not impossible, to remember what responses were given by each of the forty-eight jurors, much less the manner in which they were given. Hence, the right of counsel to probe each prospective juror's understanding and attitudes concerning pertinent legal issues and to assess his individual personality is effectively denied.
However, in this case, the improper procedure cannot form the basis for a reversal of the defendant's conviction. The defendant did not object to the method of examination until after the jury of twelve, and two alternates, had been selected and sworn. In so delaying her objection, she failed to preserve the issue for our review because "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." La.C.Cr.P. art. 841; Compare State v. Bazile, 386 So.2d 349 (La.1980), where an objection to improper voir dire after the jury was sworn was held to be untimely, with State v. St. Amant, supra, where a timely objection preserved the right of defendant to raise improper voir dire on appeal.
The defendant argues in her defense, that the circus-like conduct of the voir dire procedure, and the instances of judicial acrimony toward her objections, led to a calculated "trial strategy" to "defer the decision to object." However, the defendant had several opportunities to object to the procedure outside of the presence of the venire. Counsel did not raise the objection in the judge's chambers, where the procedure to be employed was initially outlined, approach the bench to make the objection, object before the venire was called, or submit a written motion, which would have preserved her right to raise the issue on appeal. See La.C.Cr.P. art. 841.
The purposes of the contemporaneous objection rule are to put the trial judge on notice of the alleged irregularity so that he may cure the problem and to prevent a defendant from gambling for a favorable verdict, or in this case, a favorable jury, and then resorting to appeal on errors that might easily have been corrected by objection. State v. Dupre, 339 So.2d 10 (La. 1976); State v. Marcell, 320 So.2d 195 (La. 1975). If we allowed a defendant to bypass ample opportunity for objection and still raise the irregularity on appeal, these objectives would be seriously undermined.
This assignment of error lacks merit.

*120 Assignment of Error Number Twelve

During the course of opening statement, the prosecuting attorney made the following remarks:
I will show you that they had a son, Michael D. Morris, he was ageuh17 months on that day. We will show you that they lived with this child in their apartment. That they had had at that time four childrentwo of which were deadone of which was living with other people. They lived alone in this apartment with their son, Michael Morris, age 17 months.
Defense counsel objected and unsuccessfully moved for a mistrial. Now the defense contends that the judge erred in permitting the trial to continue because the prosecutorial remarks constituted the introduction of evidence of other crimes committed by the defendant in violation of law and this court's pretrial ruling in this case. See State v. Morris, 362 So.2d 1379 (La.1978).
In our opinion, the remarks did not suggest that the defendant had committed other crimes. There was no reference to the cause of death of the two children or indication of the reason that the third child did not reside with his parents.
This assignment is without merit.

Assignment of Errors Number Fifteen, Sixteen and Seventeen
In these assignments, the defense contends that the trial judge erred in barring its cross-examination of a prosecution witness with respect to his mental health history and improperly commented on the evidence in admonishing the jury to disregard the defense attorney's questions.
Defendant's husband was called as a witness for the prosecution and testified to the events which occurred after his wife called him to come home and attend to their mortally wounded child. On cross-examination, the defense sought to impeach his credibility by showing that he had a mental abnormality. In response to defense questioning, Mr. Morris testified that he had been medically discharged from the Marine Corps in September, 1969 and had been admitted to a hospital for psychological evaluation in 1970, but he denied that he was under treatment at the time of the trial. The trial court sustained prosecution objections to questions about the details of his symptoms in 1970 and his treatment at a mental health clinic in 1973 and 1974.
As to the mental qualities of intelligence and memory, a distinction must be made between attacks on competency and attacks on credibility. Sanity in any general sense is not the test of competency, and a so-called insane person may testify if he is able to report correctly the matters to which he testifies and if he understands the duty to speak the truth. McCormick on Evidence, § 45, p. 94 (Clearly Ed.1972). Mental abnormality either at the time of observing the facts or at the time of testifying, however, will be provable on cross examination or by extrinsic evidence, as bearing on credibility. State v. Landry, 359 So.2d 99 (La.1978); State v. Luckett, 327 So.2d 365, 372 (La.1976) (on rehearing); McCormick, supra; Pugh and McClelland, Work of the Appellate Court for the 1976-1977 TermEvidence, 37 La.L.Rev. 585 (1977).
The fatal injury of the defendant's child occurred in 1977 and the testimony at issue was given in 1981. From the questions posed by the defense and the arguments presented to the court at trial, it is evidence that the evidence excluded was not relevant to prove a mental abnormality at either of these times but related to evaluation and possible treatment or counseling several years earlier. Therefore, the evidence of mental abnormality which the defense sought to introduce was not probatively related to the credibility of the witness and was correctly excluded when offered as impeachment. See United States v. Partin, 493 F.2d 750, 753 (5th Cir.1974).
The defendant further contends that the Court's ruling in the presence of the jury that the question asked was "legally improper" cast defense counsel in an extremely unfavorable light by implying *121 the deliberate use of improper tactics. In our opinion, however, the term "legally improper" would imply to a reasonable juror that the question called for the introduction of evidence that was not legally admissible and would not imply that defense counsel was guilty of deliberate impropriety.
These assignments of error lack merit.

Assignment of Error Number Twenty
By this assignment, defendant contends that the trial court erred by permitting the prosecution to elicit testimony relating an oral inculpatory statement made by the defendant which contained inadmissible other crimes evidence. Leslie Cordosco, the head ward clerk at the hospital which received the defendant's child for emergency treatment, testified that the defendant said, "Oh, Lord, I have done it again. Tell me he is not dead too." The jury was permitted to hear her testimony only after a hearing and predetermination of its admissibility out of the jurors' presence. Defense counsel duly objected to the ruling.
A defendant is entitled to insist upon introduction of the entirety of a statement sought to be used against him, although, of course, he may waive the benefits of the protective statute. La.R.S. 15:450; State v. Haynes 291 So.2d 771 (La. 1974). Consequently, when the state seeks to introduce a confession, admission or declaration against a defendant which contains other crimes evidence, but which is otherwise fully admissible, the defendant has two options. He may waive his right to have the whole statement used, object to the other crimes evidence, and require the court to excise it before admitting the statement; or, he may insist on his right to have the statement used in its entirety so as to receive any exculpation or explanation that the whole statement may afford. A third alternative, that of keeping the whole statement out, is not available to defendant, unless, of course, the confession itself is not admissible. State v. Sonnier, 379 So.2d 1336 (La.1980); State v. Snedecor, 294 So.2d 207 (La.1974); 7 Wigmore on Evidence §§ 2100, 2115 (3rd Ed.1940).
In the present case, the defendant did not waive her right of compulsory completeness or exercise her right to excise the other crimes evidence. Instead, she sought exclusively a remedy the law does not afford, complete suppression of an otherwise admissible inculpatory statement. This court's pretrial ruling that such other crimes evidence is inadmissible was not intended to permit the defendant to prevent the introduction of her otherwise admissible statement by insisting on use or non-use in its entirety. See State v. Morris, 362 So.2d 1379 (La.1978).
This assignment of error lacks merit.

Assignment of Error Number Twenty-Three
This assignment relates to the sentencing of the defendant as a third felony offender under La.R.S. 15:529.1. The state presented evidence of two prior convictions: a 1973 manslaughter conviction in Jefferson Parish; and a 1972 conviction for aggravated assault on a minor in Texas. The trial court found the defendant to be a third felony offender and sentenced her to 42 years imprisonment at hard labor.
The defendant argues that the Texas conviction may not be considered as a prior felony because of ambiguities in the documentary evidence concerning that conviction, because the Texas statute constituted an enhancement of a former penalty, and because the Texas statute was the equivalent of a Louisiana misdemeanor. These arguments are without merit.
Any ambiguity existing in the documentary evidence was resolved by the testimony of a Texas attorney called by the prosecution whom the defense counsel stipulated was an expert in Texas criminal substantive and procedural law. He testified without contradiction that his examination of the Texas court records revealed that the defendant's conviction resulted from her guilty plea in Harris County, Texas on October 17, 1972 to a violation of Article 1148a of the Texas Penal Code.
The prosecution introduced without objection a copy of Article 1148a of the *122 Texas Penal Code, which, at the time of the Texas offense, provided as follows:
(a) No person or parent of a child may intentionally maim, disfigure, or batter a child who is 14 years of age or younger or engage in conduct which by omission or commission is intended to cause physical injury to, or deformity of deficiency in, a child who is 14 years of age or younger.
(b) Any person who violates Subsection (a) of this section is guilty of a felony and upon conviction is punishable by imprisonment in the State penitentiary for a period of not less than two years nor more than five years.
(c) It shall be a defense to prosecution under this section if the act complained of was done in the exercise of the right of moderate restraint or correction given by law to the parent over the child, the guardian over the ward, the master over the apprentice, the teacher over the scholar.
Tex.Penal Code Ann. art. 1148a (Vernon 1971) (repealed by 1973 Acts, ch. 399, § 3(a)) and amended and reenacted as Tex.Penal Code Ann. art. 22.04 (Vernon 1974) by Acts 1973, ch. 399.
The conduct of which the defendant was accused and to which she pleaded guilty to under the Texas statute constituted the felony offense of Cruelty to Juveniles defined at the time of the Texas offense in Louisiana as follows:
Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
Whoever commits the crime of cruelty to juveniles shall be fined not more than one thousand dollars, or imprisoned for not more than two years, with or without hard labor, or both.
La.R.S. 14:93 (prior to amendment by 1977 Acts, No. 55, § 1).
Because the defendant was convicted under the laws of another state of a crime which, if committed in Louisiana would be a felony, that foreign state offense constitutes a felony for purposes of the habitual offender law. La.R.S. 15:529.1. That the conduct proscribed by the foreign state statute to which the defendant pleaded guilty also constitutes a lesser included misdemeanor in Louisiana does not prevent its use as a basis for a third felony offender adjudication.
The defendant argues that because Texas increased the penalty for the crime of child battery shortly before her commission of the offense, use of this conviction in a habitual offender adjudication constitutes double enhancement of her penalty. This argument appears to be a product of confusion. This court has held that where a defendant's status as a prior felon has subjected him to an enhanced penalty under certain criminal provisions, his sentence may not be further enlarged by application of the habitual offender law. Thus, convictions under La.R.S. 14:95.1 (possession of a firearm by a person convicted of certain felonies) and La.R.S. 14:110(A) (simple escape) cannot be used to enhance penalties under 15:529.1. State v. Holland, 356 So.2d 427 (La.1978); State v. Siegel, 354 So.2d 525 (La.1978); State v. Cox, 344 So.2d 1024 (La.1977); State v. Sanders, 337 So.2d 1131 (La.1976). These decisions were based on the statutory construction that La.R.S. 14:95.1 and 14:110 take into consideration the fact of defendant's previous felony conviction and that in the absence of express legislative authorization, strict construction requires that a penalty not be escalated twice for what may be an unforeseen combination of two criminal statutes. State v. Cox, supra.
In the present case, none of the felonies underlying the multiple offender adjudication, including the Texas conviction, was based on a statute which provided for more severe punishment because of a defendant's status as a convicted felon. Hence, defendant's multiple offender adjudication and sentence are not based upon an enhanced or aggravated prior felony.
This assignment of error lacks merit.

*123 DECREE
For these reasons, the defendant's conviction, adjudication as an habitual offender and sentence are affirmed.
AFFIRMED.