562 So.2d 969 (1990)
STATE of Louisiana, Plaintiff-Appellee,
v.
Hannibal Charles STANFIELD, Defendant-Appellant.
No. CR89-1123.
Court of Appeal of Louisiana, Third Circuit.
May 23, 1990.
*970 Michael J. Johnson, Marksville, for defendant-appellant.
Cliff Strider, Asst. Dist. Atty., Alexandria, for plaintiff-appellee.
Before LABORDE, KNOLL and KING, JJ.
KING, Judge.
The issues presented for review by this appeal are whether the trial court properly denied defendant's objection to the State's exercise of peremptory challenges against prospective black jurors, whether the trial court properly allowed the State to use a statement of defendant in cross-examining him when the statement was not introduced into evidence, whether the evidence was sufficient to support defendant's conviction, and whether the trial court erred in denying defendant's motion for a new trial.
On December 20, 1988, Hannibal Charles Stanfield (hereinafter the defendant) was charged by grand jury indictment with one count of first degree murder for the killing of Spencer Johnson (hereinafter the victim) on November 5, 1988, in violation of La. R.S. 14:30. Defendant was arraigned and entered a plea of not guilty. On July 27, 1989, a unanimous twelve member jury returned a verdict of guilty of first degree murder. At the sentencing phase of the trial, the jury sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant appeals this conviction and sentence urging four assignments of error. We affirm.

FACTS
On November 5, 1988, the victim was found dead in a room at the Southerner Motel in Alexandria, Louisiana. He had been shot once in the head. The background facts and circumstances leading up to this homicide appear from the record.
On the night before, and during the early morning hours of November 5, 1988, the defendant, Rickey Vincent, and Chris Johnson went to Socrates, a night club in Alexandria, Louisiana. At Socrates, they joined Jeffrey Easley, a mutual friend. At about 2:00 A.M., when the club closed, the four men left together. Defendant, Vincent, and Easley planned to go to a concert at Grambling State University the next day. They dropped Chris Johnson off at his home, proceeded to Easley's home so that he could get some fresh clothes, and then went to the Southerner Motel where Vincent had been staying for the past few days. The plan was to stay there for the night and then go to Grambling the following day.
*971 After arriving at the motel, Vincent and Easley left and went to a place in Alexandria called the Eat-A-Bit Club. Defendant stayed behind at the motel. Vincent and Easley stayed at the Eat-A-Bit for a short time and then went to the home of another friend, David Lynn Rainey. They went to Rainey's house to talk about his claim that burglars had broken into his home and had stolen stereo equipment. The victim was visiting at Rainey's house. Vincent and Easley remained at Rainey's house for a short period of time and then went back to the motel.
At about 4:00 A.M., Rainey and the victim, fearful that burglars would return to Rainey's home, went to Vincent's room at the Southerner Motel. Rainey and the victim went out and later returned with food for everyone in the room. After eating, Vincent and Easley went to sleep.
Both Vincent and Easley have a history of involvement with narcotics. Vincent admitted that he was once a "dope dealer". Easley admitted that on that very night, he had a matchbox full of cocaine in his possession. It is also important to an understanding of the events to note that in another part of the Southerner Motel, Morgan Lavalais (nicknamed "Crime Dog") and his younger brother, Alger Sanders (nicknamed "Twiggy") were in a room with their girlfriends, Felicia Moore and Rousalyn Boyd. Defendant sold cocaine to "Crime Dog" and "Twiggy" that night while Vincent stood outside their motel room door. Later that night, defendant returned to their motel room in search of something with which to smoke cocaine. The record reflects that defendant, "Crime Dog" and "Twiggy" consumed a considerable amount of cocaine on the night in question.
Easley testified that he gave defendant cocaine on more than one occasion that night. At one point, defendant asked Easley for more cocaine, but Easley refused to give him any more. Defendant became angry and continued to press Easley for more cocaine. Defendant asked Vincent "where that gun was," referring to a .38 caliber, five-shot revolver which had been in the glove compartment of Vincent's car and which had been taken into the room. It is unclear from the record exactly how the gun got into the room. Vincent testified that the gun was not his but that he knew it was in the glove compartment of his car. He did not know how the gun got into the room, however, he testified that he discovered it under a pillow on the bed and moved it under the bed. Vincent, Easley, and Rainey all testified that defendant became argumentative when Easley refused to give him any more cocaine. Both Vincent and Easley heard defendant refer to the gun. Vincent finally told Easley to give defendant more cocaine so that he would leave them alone. Easley did so and then everyone went to sleep.
Rainey testified that, after the argument, defendant went to sleep in front of the door to the room. Sometime later, Rainey realized that he had to leave in order to pick up his mother at the nursing home where she worked the all-night shift. Rainey was under the impression that the victim wanted to go to the concert at Grambling with the others, so he decided not to wake him. As Rainey was leaving, defendant followed him out into the parking lot in order to use his car cigarette lighter. Defendant used the lighter and then Rainey left.
Later that morning, but still in the predawn hours, Vincent was awakened. He saw defendant standing by the door of the room with a gun in his right hand and some other object in his left hand. He struggled with defendant and then ran into the bathroom and locked himself inside. At this point, Vincent saw blood on the floor of the bathroom. He realized he had been shot in the hand. He heard defendant trying to enter the bathroom, so he broke the bathroom window and escaped. Vincent ran to the motel office and tried to convince the manager to call the police. The manager was reluctant to do so until he saw Easley stumble toward the office, bleeding from a gunshot wound to the head.
Early that same morning, "Crime Dog," "Twiggy," and their girlfriends heard a knock on their door. "Twiggy" opened the *972 door and saw defendant standing there with no shirt on and blood on one knee of his blue jeans. Defendant told them that he, Vincent, and Easley had been involved in a fight at the Eat-A-Bit with soldiers from Fort Polk. Defendant said that Vincent was stabbed in the hand and that Easley had been hit on the head. Defendant told them not to answer the door if someone knocked. "Twiggy" testified that while defendant was outside the door, he looked through the curtains and saw Vincent running toward the office. He asked defendant if he should call Vincent and defendant said, "No, No, don't do that." Defendant entered their room and pulled a matchbox full of cocaine from his pocket. "Crime Dog" stated that he saw two bullets in defendant's pocket that became visible when he retrieved the matchbox from his pocket, and the bullets appeared to be .38 caliber. Defendant stayed in the room with "Crime Dog," "Twiggy," and their girlfriends and smoked more cocaine. Felicia Moore and Rousalyn Boyd, the girlfriends, corroborated these facts at trial. "Crime Dog," "Twiggy," and their girlfriends decided to leave the motel when they saw police arriving. Defendant stayed in their motel room.
Officer Michael Clay of the Alexandria Police Department was the first to arrive at the Southerner Motel in response to the manager's call. When he arrived, Vincent and Easley were out front. Vincent had a gunshot wound to the left hand and Easley was bleeding from a gunshot wound to the head. Officer Clay went to Vincent's room (Room Number 153) and discovered the victim lying face down on the floor at the foot of the bed. He was dead from a gunshot wound to the head. The officer also found a straightened coat hanger in the room. In the bathroom, Officer Clay observed a broken window and blood in the sink and on the floor.
Based on information provided by Vincent and Easley, police began searching for defendant. Officer Clay was walking near Room Number 153 when defendant appeared and stated, "I think ya'll looking for me." Officer Clay arrested defendant. Officer Jerry Deville who had been called to assist in the investigation, advised defendant of his Miranda rights. Officer Deville noted that defendant appeared shaken but was alert.
The police remained on the scene and continued the investigation at the Southerner Motel. In the room where the killing occurred, several pieces of physical evidence were discovered. The victim was found on the floor near the foot of the bed. Lying near the victim's feet was a five-shot.38 caliber revolver. There were five spent rounds inside the weapon. There were blood smears and spatters on the walls and a large pool of blood on the floor where the victim was found. Additionally, several .38 caliber slugs were recovered from the room. A small quantity of white powder, which police suspected was cocaine, and a marijuana cigarette were also found in the room. In Room Number 103, where "Crime Dog," "Twiggy," and their girlfriends had been, police seized a broken glass vial with a clear substance in it and a matchbox containing a white powdery substance. Two unused .38 caliber bullets were also found. Paraffin tests for gunshot residue were performed on both defendant and Vincent. Only defendant tested positively.
Officer Chris Nassif of the Alexandria Police Department was working at the City of Alexandria jail when defendant was booked. He testified that, after the booking, defendant called to him saying, "Man, I want to talk to you." The officer advised defendant that his Miranda rights were still in effect. Defendant said that he understood this and then made several potentially incriminating statements.
Based on the above evidence, defendant was charged with, tried, and convicted of first degree murder. He has appealed his conviction specifying four assignments of error.

ASSIGNMENT OF ERROR NUMBER 1
Defendant contends that the trial court erred in overruling his objection to the State's exercising four peremptory challenges against black veniremen. The defendant is black and claims that the State *973 impermissibly excluded blacks from the jury solely on the basis of race.
Eight veniremen were peremptorily excused by the State. Four of these prospective jurors were white and four were black. Defendant admits that some black veniremen were "unsuitable for service," yet maintains others were excused for no other reason than their race.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution occurs when a prosecutor, in a case against a member of a cognizable racial group, exercises peremptory challenges to remove members of the defendant's race from the jury venire for a discriminatory purpose. This rule of law was codified by the Legislature in La.C.Cr.P. Art. 795(B), which forbids the State to exercise a peremptory challenge based solely upon the race of the juror.
The defendant must establish a prima facie case of purposeful discrimination. To do this, the defendant must establish that: (1) he is a member of a cognizable racial group; (2) the prosecutor has exercised his peremptory challenges to remove other members of that race from the jury; and (3) these facts along with the other relevant circumstances raise an inference that the prosecutor used his peremptory challenges to exclude the veniremen from the jury on account of their race. Once a prima facie case is made, the prosecutor must come forward with a neutral explanation for challenging jurors in the defendant's racial group. Batson, supra; State v. Collier, 553 So.2d 815 (La.1989).
In the present case, the trial court never ruled that the defendant had successfully presented a prima facie case of the State's discriminatory use of peremptory challenges. However, immediately following defendant's objection, the prosecutor volunteered to offer explanations for the State's peremptory challenges.
When the propriety of the State's use of peremptory challenges was raised, defendant's counsel admitted that the State legitimately excluded some potential black jurors because of their positions regarding the death penalty. It appears defendant was not objecting to the State's challenge of Lillie Eldridge and Elaine Long. These two ladies were not accepted by the State because of their hesitation, or in Ms. Long's case, near refusal to apply the death penalty.
The other black venire members excluded by the State were Willora Hawkins and Willis Maude Reed. Ms. Hawkins was challenged because she stated that she knew the defendant's father for most of his life and was his neighbor. Ms. Reed was challenged because she worked at the Oasis Club and Restaurant. The prosecutor noted that this establishment was the site of many narcotic cases. While Ms. Reed may have never participated in any illegal drug activities, the prosecutor stated he felt her contacts and relationships with those who frequent the Oasis Club made her unacceptable for jury service in a criminal case.
The exclusion of jurors who are opposed to applying the death penalty to a defendant convicted of first degree murder is a legitimate, racially neutral basis for exercising peremptory challenges. State v. Lindsey, 543 So.2d 886 (La.1989). This is especially true in this case where at least two other veniremen were excused because of their equivocal positions on whether they would apply the death penalty. Moreover, defendant apparently acquiesced in the exclusion of jurors opposed to the death penalty.
The prosecutor's explanation for challenging the remaining two black members of the venire offers a legitimate, non-racial basis why the State did not want either potential juror seated. One juror was a lifelong friend and neighbor of the defendant's father. The likelihood that this juror could dispassionately consider the evidence in the case was small and naturally suspect. The final black venire member excluded by the State was challenged because of the belief that her work experience could unfavorably affect her impression *974 of the witnesses or other evidence used by the State to prove its case.
Even if the defendant's objection sufficiently established a prima facie case under Batson and Collier, the prosecutor responded with credible, non-racial, neutral explanations for the peremptory challenges. Therefore, the trial court properly overruled defendant's objection. For these reasons, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 2
Defendant contends that the trial court erred in allowing the State to continually read from a prior statement, which he had given to police, when he did not deny having made the statement and the actual statement was never introduced into evidence.
The record reflects that, when defendant was cross-examined, the State read several excerpts from a statement which defendant gave to police. When defense counsel objected, the State argued that reading from the statement was the proper use of a prior inconsistent statement to impeach a witness.[1] La.C.E. Art. 613 permits the use of prior inconsistent statements to attack the credibility of witnesses; however, before such statements may be used, a proper foundation is required. La.C.E. Art. 613 reads as follows:
"Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so."
A witness must fail to distinctly admit having made the statement before evidence of such statement may be used to impeach. The question then becomes whether a witness' inability to recall a statement constitutes a failure to distinctly admit having made it.
In State v. Singleton, 454 So.2d 353 (La. App. 4 Cir.1984), the court held that the failure of a witness to recall previous statements was a failure to distinctly admit making them, and evidence of the statements should have been allowed for impeachment purposes. This theory is not new to Louisiana jurisprudence, State v. Taylor, 192 La. 653, 188 So. 731 (1939), and State v. Johnson, 47 La.Ann. 1225, 17 So. 789 (1895), and it remains under the provisions of La.C.E. Art. 613. The defendant/witness was "given the opportunity to admit the facts" and he "failed distinctly to do so," as required by La.C.E. Art. 613.
The record reflects that the State laid a proper foundation, giving defendant the opportunity to admit making the statements. When defendant did not distinctly admit making the statement, it was proper under La.C.E. Art. 613 for the State to impeach defendant with evidence of the statement. The record also indicates that the State met its burden of showing that defendant's statement was made freely and voluntarily. See, State v. McGraw, 366 So.2d 1278 (La. 1978). Defendant testified on cross-examination that he gave the statement voluntarily and that Sergeant Coutee had advised him of his rights before taking the statement.
Defendant also contends that the use of portions of the statement, rather than introducing it in its entirety, was improper. La.R.S. 15:450 requires that a statement used against a person must be used in its entirety so that the person affected may have the benefit of any exculpation or explanation that the whole statement may afford. However, the benefits of this protective statute may be waived. State v. Morris, 429 So.2d 111 (La. 1983). The record shows that defense counsel only objected to the use of the statement for impeachment purposes, not to the use of only portions of the statement. Failure of defense counsel to contemporaneously object at the time of trial constitutes a waiver *975 of the requirements of La.R.S. 15:450. La. C.Cr.P. Art. 841. It should be noted that defense counsel had also been furnished a copy of the statement and could have introduced it in its entirety at any time, during the presentation of the defense, had the defense decided to do so.
For these reasons, we find this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 3
Defendant contends that the evidence adduced at trial was insufficient to support his conviction beyond a reasonable doubt. When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State Ex Rel. Graffagnino v. King, 436 So.2d 559 (La.1983). It is the role of the factfinder to weigh the respective credibility of the witnesses and, therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See, State Ex Rel. Graffagnino, supra.
In order for the State to obtain a conviction, it must prove the essential elements of the charged offense, first degree murder, beyond a reasonable doubt. Louisiana's first degree murder statute, La.R.S. 14:30, reads in pertinent part as follows:
"A. First degree murder is the killing of a human being:
* * * * * *
(3) When the offender has the specific intent to kill or to inflict great bodily harm upon more than one person;
* * * * * *
The elements of the statute which must be proved beyond a reasonable doubt are the killing of a human being and, in this case, the specific intent to kill or inflict great bodily harm upon more than one person.
The State called thirteen witnesses at trial; five police officers, one forensic pathologist, and seven individuals who were at the Southerner Motel at the time of the killing.
The State proved that on November 5, 1988, defendant, Ricky Vincent, Jeffrey Easley, Daniel Rainey and the victim were together in Room Number 153 at the Southerner Motel in Alexandria, Louisiana. In another part of the motel, Room Number 103, Morgan "Crime Dog" Lavalais and Alger "Twiggy" Sanders were with their girlfriends, Felicia Moore and Rousalyn Boyd. The testimony indicates that defendant sold cocaine to "Crime Dog" and "Twiggy" and that he, along with these individuals, used drugs extensively on the night of the shooting. Easley and Vincent both testified that defendant became angry and argumentative when Easley refused to supply him with more cocaine. They both heard him refer to a gun that was in the room. Rainey also heard the argument, but did not testify that he heard defendant refer to the gun. Easley, at Vincent's urging, finally gave defendant more cocaine in order to end the argument.
Rainey testified that he left the room early in the morning of November 5, 1988, in order to pick up his mother from work. Vincent, Easley and the victim were asleep when Rainey left. Defendant, who had been lying on the floor, followed Rainey outside to use his car cigarette lighter and this was the last time Rainey saw defendant.
Vincent testified that he was awakened by something and saw defendant with a gun in his right hand and another object in his left hand. The two struggled briefly and Vincent ran into the bathroom and locked himself in. Vincent discovered that he had been shot in the hand in the struggle. As defendant tried to enter the locked bathroom, Vincent broke the bathroom window, climbed out and ran to the motel manager's office. A straightened coat hanger was later found in the room.
Easley woke up to discover he had been shot in the head. His pants were unbuttoned and halfway down his legs. He testified that he did not go to sleep with his pants unbuttoned. He stumbled and *976 crawled to the manager's office, bleeding from the gunshot wound.
Meanwhile, "Crime Dog" and "Twiggy" heard a knock on their door. When "Twiggy" looked through the curtain, he saw defendant outside. He opened the door and saw defendant with no shirt on and blood on one knee of his blue jeans. He also saw Vincent running toward the manager's office. "Twiggy" asked defendant if he should call Vincent and defendant replied no. Defendant told them that he, Vincent and Easley had been involved in a fight in which Easley had been hit in the head with a pistol, and Vincent had been stabbed in the hand. Defendant told them not to open the door if anyone knocked. At this time defendant produced a matchbox of cocaine from his pocket. While defendant was removing the matchbox, "Crime Dog" saw two unused bullets, which appeared to be .38 caliber, in defendant's pocket. Two .38 caliber bullets and a matchbox full of cocaine were later recovered by the police in Room Number 103. Defendant remained in Room Number 103 for some time after "Crime Dog" and "Twiggy" left with their girlfriends.
When the police arrived at the motel, Vincent and Easley were waiting, both wounded and bleeding. Because of information furnished by them, the police began to search for defendant. Defendant voluntarily surrendered himself to the police at the scene. He was arrested, explained his Miranda rights, and taken to the City jail.
The officers continued their investigation and found the victim facedown on the floor near the foot of the bed in Room Number 153. Near the victim's feet was a five-shot.38 caliber revolver with five spent rounds in the cylinder. There were blood smears and spatters on the walls and a large pool of blood on the floor next to the victim. Five .38 caliber slugs were accounted for; one in the headboard of the bed, one in the wall, one on the floor underneath the victim, one lodged in the victim's skull and one lodged in Easley's skull. A small amount of white powdery substance was seized from the room, along with a marijuana cigarette. A matchbox full of cocaine and two unused .38 caliber bullets were found in Room Number 103.
Paraffin tests for gunshot residue were administered to defendant and Vincent. Only defendant tested positively. Photographs of the bathroom in Room Number 153, along with testimony of the officers involved in the investigation, showed that no water had been run in the bathtub and that although some water had been run in the sink, the blood which was found there did not appear diluted. This casts great doubt upon the defense theory that Vincent could have washed gunshot residue from his hands while he was in the bathroom.
Dr. George McCormick, a forensic pathologist, confirmed that the victim was killed with a .38 caliber gunshot wound to the head, which lacerated the brain and caused heart and lung failure. Dr. McCormick also testified that the victim had no cocaine whatsoever in his system.
Officer Chris Nassif of the Alexandria Police Department testified that he was working at the City jail when defendant was brought in and booked. Defendant called to Officer Nassif, saying, "Hey Man, I want to talk to you." The officer advised defendant that his Miranda rights were still in effect to which defendant replied he understood. He then told the officer that he had smoked cocaine and marijuana and that a broken test tube could be found at the motel. He then said, "Look, if I killed one of my friends, I don't know. I was high." Defendant told the officer that he didn't know where the gun was but that it was a .38 caliber revolver with nickel finish. At this point defendant withdrew from the conversation. Officer Nassif testified that defendant made these statements freely and voluntarily and that no coercion took place.
When defendant testified at trial, he did not dispute the testimony of Vincent, Easley, Rainey, "Crime Dog", "Twiggy", or their girlfriends. He recounted going to the Socrates club and leaving when it closed. He recounted using drugs and selling them to "Crime Dog" and "Twiggy" at the Southerner Motel. He testified that he followed Rainey outside to use his car cigarette *977 lighter. The next thing defendant claims to remember was being awakened by Vincent. He said he saw the gun on the floor, which he stated he picked up and placed on the bed. Defendant said he then went to Room Number 103. His next vivid memory was the sight of police outside the door. Defendant could not say that he did not shoot anyone, only that he could not remember shooting anyone.
Since the evidence in this case is circumstantial, the law requires that every reasonable hypothesis of innocence be excluded in order to convict. La.R.S. 15:438. Defendant also raised the defense of an intoxicated or drugged condition at trial. However, intoxication is an affirmative defense and, therefore, the burden is on the defendant rather than the State in this regard. State v. Salas Martinez, 524 So.2d 871 (La.App. 3 Cir.1988), writ den., 525 So.2d 1047 (La.1988).
We find that, when the evidence adduced at trial is viewed in the light most favorable to the prosecution, seeking to exclude every reasonable hypothesis of innocence, defendant's conviction must stand. The following factors support this conclusion:
(1) Out of four individuals in Room Number 153 when the shooting occurred, only defendant escaped without injury;
(2) Defendant and Vincent were tested for gunshot residue and only defendant tested positively. The amount of undiluted blood in the bathroom sink discounts the theory that Vincent washed gunshot residue from his hands;
(3) Defendant argued with Easley over cocaine earlier that night and referred to the gun during the argument;
(4) Vincent testified that he awakened to see defendant holding the gun in his right hand and clutching another object in his left hand;
(5) Police found a straightened coat hanger in the room, indicating that it was used in an attempt to open the bathroom door;
(6) Defendant had blood stains on his pants leg, but was not injured in any way;
(7) Easley awakened to find his pants unbuttoned and halfway down, indicating that they were unbuttoned in order to retrieve something from his pockets;
(8) The matchbox full of cocaine which had been in Easley's possession was discovered in Room Number 103, where defendant admitted that he went that morning. Witnesses also observed the matchbox of cocaine in defendant's possession;
(9) A witness observed two unused .38 caliber bullets in defendant's pocket. These were later discovered in Room Number 103;
(10) Defendant told the parties in Room Number 103 that he, Vincent and Easley had been in a fight at the Eat-A-Bit and offered explanations for each of their injuries. Easley and Vincent did not testify of any such fight;
(11) Defendant told the persons in Room Number 103 not to answer the door if anyone knocked. He also discouraged "Twiggy" from summoning Vincent when Vincent was seen running towards the manager's office;
(12) Defendant provided a relatively detailed description of the gun in the room, as well as the location of a broken test tube while at the City jail; and
(13) Defendant gave incriminating statements.
These facts exclude all reasonable theories of innocence. Defendant did not sufficiently prove the existence of an intoxicated or drugged condition. The police testified that, when defendant was arrested, he appeared dazed, but alert. His detailed description of the gun and the location of a broken test tube at the motel suggests that defendant was in sufficient control of his mental faculties to exclude the possibility that an intoxicated or drugged condition precluded intent. Furthermore, defendant left the scene of the crime, went to Room Number 103 and eventually turned himself in to the police. These actions suggest that he was aware of his actions.
As noted earlier, the issue of sufficiency of evidence often hinges upon the jury's determination of witness credibility. The question of credibility is within the sound *978 discretion of the trier of fact. Their factual determinations are entitled to great weight and will not be disturbed unless contrary to the evidence. State v. Klar, 400 So.2d 610 (La.1981); State v. Cobbs, 350 So.2d 168 (La.1977). In this instance, the jury determined that the State witnesses were credible. There is nothing in the record to suggest that this determination was contrary to the evidence, particularly in light of the Jackson standard of review.
Therefore, we conclude that this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 4
Defendant contends that the trial court erred in denying his motion for a new trial on the basis that he was prejudiced because a pamphlet discussing the drug problem in Rapides Parish was present in the jury deliberation room. It was discovered in the jury room by court personnel after the jury was dismissed and was brought to the trial judge's attention, who in turn notified the attorneys. While no one could be certain when the pamphlet was placed in the jury room, its discovery formed one of the grounds for defendant's motion for a new trial.
The trial court found no merit in defendant's motion because defendant neither established when the pamphlet was placed in the room nor whether the jury considered the pamphlet, even if it had been present during their deliberations. Defendant complains on appeal that this burden was "unwarranted" and "impossible."
La.C.E. Art. 606(B) states:
"Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberation or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes." (Emphasis supplied.)
Defendant argued his motion for a new trial to the trial judge before his sentencing. Defense counsel never requested that the trial court permit the jurors to testify or sought to introduce their testimony as to whether or not the pamphlet was in the jury room when they deliberated or whether it had influenced them. Neither did defendant attempt to call the court official who discovered the pamphlet to establish how soon after the jury was dismissed that the pamphlet was found. Under the exception contained in La.C.E. Art. 606(B) jurors are allowed to testify as to whether any outside influence was improperly brought to bear on their deliberations. The pamphlet would be an outside influence; therefore, it was not impossible for defendant to establish when the pamphlet was in the jury room and whether or not it had a bearing on the verdict of the jury. Defendant, however, had an opportunity to offer such evidence but failed to do this; therefore, the trial judge's denial of the motion for a new trial on this ground was not erroneous.
For the reasons assigned, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The Louisiana Code of Evidence applies to cases instituted or trials commenced on or after January 1, 1989. Acts 1988, No. 515, Section 12, Subsections (1) and (2). See, State v. Adams, 550 So.2d 595 (La.1989), Footnote 2.