liKLEES, Judge.
On October 7, 1993, the appellant was in-dieted for the second degree murder of Mark Broxton. At his arraignment on October 21st he pled not guilty. His first trial ended in a mistrial on July 8, 1994, when the jury could not reach a verdict. However, on July 13, 1995, at the end of a three-day trial, another twelve-person jury found him guilty as charged. On July 19, 1995 the appellant noted his readiness for sentencing, and the court sentenced him to life imprisonment without benefit of parole, probation, or suspension of sentence. His motion for appeal was granted on that date. The appellant was granted time to file a pro se brief, but as of this date he has not done so.

FACTS

On the evening of April 13, 1993, Mark Broxton was shot four times while standing at a pay telephone outside a grocery store at the corner of General DeGaussed and Whitney Avenues. Officers responding to the call of a shooting found Broxton lying on the floor of the store. Broxton was still conscious when the officers arrived, and although at first he stated he did not know who shot him or why, he subsequently stated he would “take care” of the matter himself. The officers transported Broxton to a hospital where he died. An autopsy revealed four gunshot wounds to Broxton’s right side, two of which were lethal. Analyses of his blood and urine were negative for alcohol and *58 drugs. Officers on the scene also discovered a ear parked in front of the store with bullet holes in its side, but the owner of the car denied seeing the shooting. A witness to the shooting described the assailant as wearing a blue, purple, and black windbreaker and dark clothes. Officers discovered a jacket matching this description in a dumpster in a nearby housing project.
^Officers investigating the shooting learned Earl Pierce and Norma Varist were witnesses to the shooting. Based upon information received from other sources, the defendant Kuantau Reeder became a suspect in the shooting. Pierce viewed a lineup containing Reeder’s photograph, which he chose as portraying the man who shot Broxton. Although the officers also received information that Berjerack Johnson was involved in the shooting, neither Pierce nor Ms. Varist identified Johnson’s photograph in a lineup. A third witness, Ella Fletcher, told the police only that the shooter was wearing a blue and black jacket.
Earl Pierce testified he often visited the food store where the shooting occurred. He testified that on the evening of the shooting, he was parked across the street from the store, helping someone jump-start his ear. Pierce testified that while waiting for the battery to charge, he noticed Broxton talking on a telephone outside the store. He testified a car pulled up to Broxton, and the passenger of the car, whom he identified as Reeder, got out of the ear and approached Broxton. Pierce testified Reeder was wearing a blue and red windbreaker. Pierce testified he saw Broxton and Reeder talk and then begin arguing, and when Broxton put his hands in the air, Reeder shot him twice. Broxton tried to run inside the store, and Reeder shot him two more times and also shot two additional times; these bullets missed Broxton but struck a car parked outside the store. Reeder then walked around the building out of sight, while Broxton entered the store. Pierce testified he went into the store to get a cold drink, and while he was at the counter, Broxton walked up to the counter with a cold drink and then collapsed. Pierce testified that later he saw Reeder walk back around the corner of the store, walk into the project, and discard his jacket in a dumpster. Pierce insisted Reeder returned and then discarded the jacket before the police arrived. Pierce admitted having a prior conviction in Mississippi for assault and battery with the intent to kill involving a shotgun. He also admitted he may not have told the police about 13Reeder arriving in a car. He denied drinking anything prior the shooting. The pathologist who performed the autopsy testified that although death would not have been instantaneous, it was unlikely Broxton would have been able to walk into the store, retrieve a drink, and take it to the counter prior to collapsing.
Norma Varist was called to the stand, but she refused to testify and was held in contempt. An officer who eventually arrested Reeder testified Ms. Varist told him she did not want to testify against Reeder because of unspecified circumstances between her family and Reeder’s family.
Although Reeder did not testify at trial, his testimony from his previous trial was admitted. At the earlier trial, Reeder insisted he did not shoot Broxton. He testified he and several other friends were playing basketball on a court in the project when they heard the shots. Although they halted play for a few minutes, they resumed playing, and it was not until much later he learned Brox-ton had been shot. Reeder testified he knew Broxton and had grown up with him, and he insisted he had never gotten into a fight with Broxton. He testified he was wearing a T-shirt and shorts on the evening of the shooting. He denied wearing a jacket, denied running past Price or even going near the food store that night, and denied telling Norma Varist he had shot Broxton. He also denied having a fight with a man named Michael Loving and shooting Broxton in retaliation for Loving pulling a gun on him. He admitted having prior convictions for possession with the intent to distribute cocaine and simple possession of cocaine.
The defense presented the testimony of Osama Ali, a cashier at the food store, from the earlier trial. Ali testified that although Reeder came in the store often, he could not remember if he saw Reeder in the store the night of the shooting. He also testified *59 Pierce often hung out behind the store drinking beer. Ali testified he heard the shots and looked out the window, and he saw everyone outside hitting the ground. The victim came inside the store and threw himself on|4the counter, asking him to call the police. The victim then collapsed on the floor. Ali testified the victim could barely walk and did not walk back to the cooler to get a cold drink prior to collapsing. Ali also testified he did not remember seeing Pierce in the store, and that if Pierce were there he must have come inside before the victim entered because the other cashier locked the door after the victim entered. Ali testified there were two or three customers in the store at the time of the shooting. He estimated the police arrived at least ten minutes after being notified, and the police took the victim to the hospital.
Shannon Mitchell testified he saw Reeder at approximately 1:00 or 2:00. He testified Reeder and other men were on their way to play basketball and asked Mitchell to join them. Mitchell testified Reeder was wearing shorts and a T-shirt and did not have a jacket. Mitchell testified that a few hours later he saw Broxton arguing with someone on a porch of the project. Mitchell testified the man was not Reeder. Mitchell testified Broxton then walked toward the food store. Later, around dusk, Mitchell heard gunshots and went to investigate. By that time, the police had arrived, and he saw Broxton lying on the floor of the store. He also testified he did not see Pierce’s van parked near the store.
Mitchell admitted being in jail at the time of trial for possession of cocaine, and he admitted having prior convictions for distribution of cocaine, possession with the intent to distribute cocaine, and possession of marijuana. He also admitted he had previously testified he had heard the shots twenty to thirty minutes after he saw Reeder and his friends and five to fifteen minutes after seeing Broxton arguing with the other man. He also admitted he never told the police he saw Broxton and the other man arguing prior to the shooting.
Katiti Douglas also placed Reeder on the basketball court at the time of the shooting. She testified she watched Reeder and others playing basketball for thirty to forty-five minutes before someone came up to them to tell them about the |sshooting. The men played another fifteen minutes before leaving. Ms. Douglas admitted her husband is a good friend of the defendant.
Shirley Reeder, the defendant’s mother, testified Reeder ate with her that day. Although she did not remember what time Reeder left, she testified he was wearing a long-sleeved shirt and shorts.
Ms. Kirshon Smith testified she had been dating Broxton prior to his death. She testified Berjerack Johnson was the father of her child. She testified that sometime prior to the shooting, while Johnson was incarcerated, Broxton was visiting her when Johnson called from jail. She testified Johnson heard Broxton’s voice in the background and told her he would make Broxton “pay”. She admitted she did not remember when Johnson was released from jail, but Johnson called her the night Broxton was shot to tell her of the shooting. Ms. Smith admitted, however, that Johnson did not tell her he shot Broxton. She also admitted she heard rumors that Reeder shot Broxton because of an “altercation” they had on Easter.

A. Errors Patent

A review of the record for errors patent reveals there are none.

B. Assignments of Error

I.
By his first assignment of error, the appellant contends the trial court erred by allowing the State to introduce evidence of other crimes committed by the appellant which was not admissible and of which the State did not give notice prior to trial of its intention to introduce. The evidence to which the appellant objected was presented through the testimony of the appellant from his first trial, which ended in a mistrial. In this testimony, he testified he had a prior conviction for possession with the intent to distribute cocaine, and then later admitted the charge |6was distribution of cocaine and that he had a second similar conviction. The *60 appellant now argues this evidence should not have been introduced because it was not relevant to the charge in this case and because the State did not give sufficient notice of its intent to introduce it.
The State argues this issue has not been preserved for appeal because defense counsel failed to specify exactly upon what grounds the objection to this evidence was made, and a new basis for an objection cannot be raised on appeal. See La.C.Cr.P. art. 841; State v. Straughter, 630 So.2d 884 (La.App. 4th Cir. 1993), writ denied, 94-0357 (La.9/1/95), 659 So.2d 504. A reading of the trial transcript shows that while counsel did not refer to Prieur in his objection, his objection was based on his belief that this was inadmissible evidence of other crimes. Thus, the merits of this assignment will be addressed.
In support of his argument, the appellant cites La. C.E. art. 404(B), as well as State v. Prieur, 277 So.2d 126 (La.1973) and its progeny. This reliance is misplaced. Art. 404(B) and Prieur concern the introduction of evidence of other crimes to show “motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident”. In addition, art. 404(B) provides for the introduction of evidence of other crimes where it “relates to the conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” By contrast, here the evidence of the appellant’s prior convictions was elicited at the first trial by the State for impeachment purposes.[1] La. C.E. art. 609.1 provides in part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
LB. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
Thus, this evidence of other crimes was admissible at the first trial for impeachment purposes. As discussed below with respect to the appellant’s second assignment of error, this evidence was also admissible at the second trial because by testifying at the first trial, the appellant waived his Fifth Amendment right against self-incrimination.
In addition, the State timely gave notice of its intent to use this evidence. Prior to opening statement, the State filed a notice of its intent to introduce the appellant’s prior testimony. The State notes this was done in conformity with La.C.Cr.P. art. 768, which provides the State must advise the defense prior to the State’s opening statement of its intent to introduce a confession or inculpato-ry statement made by the defendant. The State likens the appellant’s admissions concerning his prior convictions to a confession. Thus, it appears the State timely notified the defense of its intent to introduce this evidence. In addition, in State v. Parker, 436 So.2d 495, 499 (La.1983), the Court held the failure of the State to give pretrial notice of its intent to introduce the defendant’s testimony from an earlier trial was not reversible error because “doubtless, the defendant and his attorney, who represented him at both trials, had actual notice of his earlier testimony and could not have been surprised.” Here, there was notice.
This assignment has no merit.
II.
By his second assignment, the appellant contends the trial court erred by failing to excise from his prior testimony references to his prior convictions. He | ¡¡concedes his testimony from the prior trial is admissible at a subsequent trial. See State v. Parker, 436 So.2d 495 (La.1983), where the Court held that a defendant who takes the stand without asserting his Fifth Amendment rights waives these rights, and his testimony may be admitted against him at a subsequent trial. The appellant insists, however, that he *61 should have been allowed to excise any reference to his prior convictions. He cites Parker, where the court excised part of the defendant’s prior testimony prior to allowing it to be introduced into evidence. However, the testimony which was deleted was the cause of the mistrial in the first trial. Here, by contrast, the appellant’s testimony concerning his prior convictions did not cause the mistrial in the first trial and indeed was admissible as impeachment testimony at that trial.
The appellant likens his testimony at the earlier trial to a confession or statement, and he contends he was entitled to have the references to other crimes, i.e. the prior convictions, deleted prior to the introduction of the testimony. In support, he cites State v. Bourque, 622 So.2d 198 (La.1998), where the Court discussed the problem of a confession which referred to other crimes not admissible at trial. The Court noted a defendant has the right to have a confession read in its entirety (La. R.S. 15:450). However, when the confession contains evidence of inadmissible other crimes, the defendant may either have the evidence omitted or “may insist on his right to have the statement used in its entirety so as to receive any exculpation or explanation that the whole statement may afford.” Id. at 234, quoting from State v. Morris, 429 So.2d 111, 121 (La.1983).
The appellant contends that under the reasoning of Bourque, he should have been allowed to have the references to the prior convictions deleted prior to the testimony being read. However, Bourque is not applicable to this case. The “other crimes” evidence in Bourque referred to an unrelated shooting, evidence of which was not admissible at the trial of the crimes for which he was being tried. | gBy contrast, here evidence of the appellant’s prior convictions would be admissible for impeachment purposes, as it was admissible at the first trial. As noted by the State, the effect of deleting this testimony would be to allow the appellant to testify without allowing the State the right to full cross-examination. Therefore, there was no basis for the deletion of these references to the appellant’s prior convictions, and the trial court did not err by denying the appellant’s motion to have these portions of the testimony excised prior to having the testimony read to the jury. This assignment of error has no merit.
III.
By his final assignment of error, the appellant argues, the trial court erred by denying his motion for new trial based upon his allegation that the State withheld Brady material, that being the whereabouts of Osa-ma Ah, the clerk at the store in front of which the victim was shot. Mr. Ali testified at the first trial, and the defense subpoenaed him to testify at the second trial. However, the defense was unable to find him, and it ultimately introduced his testimony from the first trial. On the day the verdict was rendered in this ease, the defense learned the State was prosecuting Mr. Ah in an unrelated case that day in another section of court. The appehant argues the State had “constructive notice” of Mr. Ah’s whereabouts, which it should have provided to the defense. He further argues that his right to a fair trial was violated because instead of being able to present the hve testimony of Mr. Ah, the defense was forced to present his prior testimony to the jury. The appehant notes the testimony of Mr. Ah partially contradicted that of Earl Pierce, the sole eyewitness to the shooting, whose testimony the appehant characterizes as “confused at best and self-contradictory and evasive at worst.” The appehant contends Mr. Ah’s hve testimony would have had much more of an impact than the reading of his prior testimony.
| iqTo comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence which is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Phillips, 92-1063 (La.App. 4th Cir. 2/29/96), 670 So.2d 588. Included in this rule is evidence which impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). “[T]he prosecutor is not required to dehver his entire file to defense counsel, but *62 only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment.” State v. Rosiere, 488 So.2d 965, 970 (La.1986). See also Phillips.
Materiality was defined in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability is a probability sufficient to undermine confidence in the outcome.” The same test is to be employed whether or not the defense makes a pretrial request for exculpatory evidence. Bagley; Phillips.
In Kyles v. Whitley, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995), the Court discussed “materiality”:
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted' ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) _ Bagley’s touchstone of materiality is a “reasonable probability” of a different result, and the adjective is important. The question is not whether the defendant [nwould more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A “reasonable probability” of a different result is accordingly shown when the Government’s evidentiary suppression “undermines confidence in the outcome of the trial.” Bagley, 473 U.S., at 678, 105 S.Ct., at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
The Court further noted that once materiality is found, no “harmless error” test can be applied because a “reasonable probability” that a different result would have occurred necessarily shows that the suppression must have influenced the jury’s verdict. The Court also noted that when addressing multiple Brady claims, the reviewing court must consider the claims collectively, not on an item-by-item basis. Kyles, 514 U.S. at 434-437, 115 S.Ct. at 1566-1567.
Here, there is no indication the prosecutors in this case were aware of Mr. Ali’s whereabouts; indeed, the appellant does not argue they were aware, but rather he argues the prosecutors in this case should have been charged with “constructive knowledge” of Mr. Ali’s whereabouts because the State was prosecuting Mr. Ali in a different section of court. The appellant notes that prior to trial the State was aware the defense was having trouble finding Mr. Ali. He also notes that while the State supplied rap sheets for the other expected defense witnesses, it did not supply Mr. Ali’s rap sheet. He contends the State knew Mr. Ali’s testimony would contradict portions of that of Mr. Pierce, the sole State | ^eyewitness to the shooting. For that reason, he argues, the State violated its duty to supply Brady material, Mr. Ali’s whereabouts.
It must be noted, however, the appellant was not estopped from presenting any testimony by Mr. Ali. Because the defense did not know Mr. Ali’s whereabouts, it was allowed to present his testimony from the first trial, which included all of the inconsistencies mentioned by the appellant. In addition, this testimony was presented by the defense at the first trial, and at that time the defense was allowed a full direct examination of Mr. *63 Ali to elicit these inconsistencies with the testimony of Mr. Pierce. Although the student practitioners were different at the second trial, the same supervising attorney was present at both trials. The appellant does not allege any additional information that it was not allowed to present due to Mr. Ali’s absence at the second trial. Instead, he argues that the “live” testimony of Mr. Ali would have been more effective and would have caused the jury to reach a different conclusion. This argument is mere speculation. Although the first trial, where Mr. Ali testified, ended in a hung jury, many of the defense witnesses were different in the two trials, including the appellant himself, who testified in his own behalf at the first trial and did not testify at the second trial. Thus, it cannot be said that the conviction at the second trial was due to the reading of Mr. Ali’s prior testimony rather than the presentation of his live testimony.
Thus, even if the prosecutors were to be charged with “constructive knowledge” of Mr. Ali’s whereabouts, it does not appear the failure to inform the defense of this knowledge would not rise to the level of materiality contemplated by Brady and Kyles. The appellant was allowed to try to impeach the credibility of Mr. Pierce with the prior testimony of Mr. Ali, which his counsel elicited at the earlier trial. The jury was aware of the inconsistencies between the testimony of Mr. Ali and Mr. Pierce and apparently chose to believe Mr. Pierce. A credibility | ^determination by a trier of fact will not be disturbed on appeal unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938 (La.1984); State v. Boyd, 95-1248 (La.App. 4th Cir. 8/28/96), 681 So.2d 396. The inconsistencies noted by the appellant do not rise to such a level that would show the jury abused its discretion. The appellant has not shown that there is a “reasonable probability” that the verdict would have been different if the defense had produced “five” testimony of Mr. Ali instead of his testimony at the earlier trial.
As noted by La.C.Cr.P. art. 851: “The motion for a new trial is based upon the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegation it is grounded.” The trial court did not err by denying the motion for new trial based upon the alleged Brady claim. This assignment of error has no merit.
Accordingly, for the reasons expressed above, the conviction and sentence of defendant Kuantau Reeder are hereby affirmed.

AFFIRMED.

. The initial question about the prior convictions was asked by defense counsel, probably to mitigate the effect this information would have on the jury when it learned of the prior convictions during cross-examination.