822 So.2d 657 (2002)
STATE of Louisiana, Appellee
v.
Gabriel LOGAN, Appellant.
No. 36,042-KA.
Court of Appeal of Louisiana, Second Circuit.
June 14, 2002.
*659 Gabriel Logan, Pro se.
Carey J. Ellis, III, Abita Springs, for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Edwin L. Blewer, III, J. Thomas Butler, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART and CARAWAY, JJ.
CARAWAY, J.
Defendant and an accomplice were charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. A jury convicted defendant, and the trial court imposed a sentence of life imprisonment. On appeal, the defense argues that the state failed to present sufficient evidence to support the jury's second degree murder verdict. Secondly, defendant argues in his pro se brief that witnesses' prior inconsistent statements were improperly admitted in evidence, that the bill of indictment charging him with murder was insufficient, and that both his trial and appellate counsel were ineffective. Our review of the record reveals that the *660 evidence supports defendant's second degree murder guilty verdict. Defendant's pro se assignments are also without merit. Therefore, defendant's conviction and sentence are affirmed.

Facts
In the evening of January 4, 1998, Calandria Iverson ("Calandria") ordered pizzas from Pizza Hut. The pizzas were delivered by a Pizza Hut employee, Jarvis Griffin ("Griffin"). The following individuals, many of whom testified at trial, were at Calandria's home when Griffin delivered the pizzas: (1) Trimeka Mack, (2) Nathan Logan, (3) the defendant, Gabriel Logan ("Logan"), (4) Walter Shaw, (5) Christopher Moore, and (6) Patrick Anthony. According to trial testimony, defendant's accomplice, Corey Williams ("Williams"), was outside Calandria's home with other people when the pizzas were delivered.
The witnesses' testimony establish the following facts. When Calandria paid for the pizza at the house door, Logan went outside. Calandria saw Logan talking to Williams, but could not hear what they were saying. Several witnesses testified that they observed Logan remove something from underneath his shirt, and that Williams then took the object and placed it under his shirt. After paying for the pizzas, Calandria closed the door; moments later the witnesses heard three gun shots. Christopher Moore was outside the house at the time the shots were fired. He stated that after Griffin was shot, he saw Williams run down the street to his grandmother's house. Witnesses inside Calandria's house at the time of the shooting stated that after the shots were fired, they ran outside and saw the pizza delivery car drifting down the street. The car crossed a yard and hit a neighbor's house. Witnesses further testified that Logan ran to the car, opened the door, pulled Griffin out of the car, and went through Griffin's pockets. A few witnesses stated that Logan attempted to drive away in Griffin's car, but the car would not move. Eyewitnesses claim that Logan walked away from Griffin's car with pizzas, a green money bag and a satchel. At trial, Trimeka likewise confirmed that Logan was wearing a grey shirt at the time of the incident.
Logan's brother, Nathan, stated at trial that he did not see Logan pull the victim out of the car, nor did he witness his brother stealing anything from the car. Nathan claimed that he told Logan to get away from the car, and that after Logan walked away from the car, they both walked to their mother's house. Nathan testified that Williams called to speak with Logan while at their mother's house. Afterwards, Nathan, Patrick Anthony, Logan and his mother returned to the crime scene. On the way to the scene, Logan's mother threw a pizza box into a trash dumpster. Nathan testified that he saw Logan and Patrick remove a gun from a barbeque pit located at Williams' grandmother's house. Patrick wiped the gun, placed it in an empty potato chip bag, and buried it in a lot near a dead-end street.
The defendant's mother, Evelyn Logan Jefferson, testified at trial. She stated that on the night of the murder, Logan came to her house carrying a box of pizza. Jefferson testified that later in the night, police arrived at her house to question defendant and Nathan. Jefferson consented to a search of her home. Officers found a grey shirt, which belonged to Logan. The shirt had bloodstains on the back and on the sleeves. The blood was later determined to be the victim's blood, based upon examination by the North Louisiana Crime Lab.
When police officers arrived at Jefferson's mother's house to investigate, Nathan and Patrick took officers to the gun's *661 location. The officers also confiscated $10 from Nathan, which was a portion of the money taken from the victim. Nathan acknowledged that on prior occasions, he saw Logan in possession of the gun used to kill Griffin.
Shreveport Police Sergeant Ronnie Gryder ("Sergeant Gryder") investigated Griffin's murder. Sergeant Gryder testified that upon arriving at the scene, he observed the victim's car smashed against concrete steps at 2603 Darien Street. He also found that Griffin's car widow was shattered. A red vinyl pizza bag was lying on the ground underneath the car door. There was a burgundy cowboy boot lying on the grass next to the vehicle. A wallet was also found on top of the vehicle's hood. A driver's license was found in the wallet and used to identify the victim. Sergeant Gryder stated that during the investigation of the crime scene, officers began a neighborhood canvass to gather information. Calandria, Trimeka, Walter, and Derrick White were taken to the police station for questioning. Sergeant Gryder and Officer Kevin Strickland both testified that during questioning, Calandria stated that she observed Logan give a gun to Williams. Sergeant Gryder also testified concerning the search of Jefferson's residence.
Other Shreveport Police officers testified to similar findings. The officers' combined testimony provided that the victim's wallet was found at the scene; that a Pizza Hut warming bag was found on the ground beside the vehicle; that a .25 caliber handgun was found during the investigation; that both of the victim's front pockets were turned inside out, and the right rear pocket was torn loose from the pants; and that a green money bag and pizza box were recovered from a nearby dumpster.
Dr. McCormick, the coroner, testified that a .25 caliber bullet went through one of Griffin's lungs, through a portion of his heart, and into the other lung. Dr. McCormick also testified that it could have taken up to five minutes for the victim to be incapacitated from the shooting.
Logan and Williams were later arrested and charged with first degree murder. The charge was amended by the state to second degree murder. After hearing the above testimony and reviewing the physical evidence, the jury returned a verdict of guilty as charged. Logan appeals his conviction, assigning several errors.

Discussion

Sufficiency of the Evidence
Logan first argues that the evidence presented at trial was insufficient to support his second degree murder conviction. Particularly, Logan asserts that the state failed to prove the necessary elements of murder during the commission of a robbery, or that he acted as a principal thereto. He admits the state proved beyond a reasonable doubt that Williams shot the victim. However, defendant contends that no one testified that he and Williams spoke immediately before the incident, planned the shooting of the victim, nor did the evidence prove that they arrived at the location of the crime together. Logan argues that no evidence was submitted to show a plan between he and Williams to commit a robbery. Logan also states that assuming he did, in fact, give Williams a pistol, that fact alone does not prove that Logan had knowledge that Williams would use the gun to shoot anyone. Finally, Logan contends that even if he stole something of value from the victim after the victim's car struck the neighboring house, the theft was not during the commission of Williams' crime.[1]
*662 The question of sufficiency of the evidence is properly raised by a motion for post-verdict judgment of acquittal. La. C.Cr.P. art. 821; State v. Gay, 29,434 (La. App.2d Cir.6/18/97), 697 So.2d 642. The record shows that Logan properly raised the issue of sufficiency in the trial court in a motion for post-verdict judgment of acquittal, which the trial court subsequently denied.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier-of-fact, reviewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier-of-fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir. 1986), writ denied, 499 So.2d 83 (La.1987). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion. State v. Robinson, 34,383 (La.App.2d Cir.2/28/01), 780 So.2d 1213, writ denied, XXXX-XXXX (La.3/28/02), 812 So.2d 642; State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. When the direct evidence is viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier-of-fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Robinson, supra; State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common *663 experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Sutton, 436 So.2d 471 (La. 1983); State v. Owens, supra.
When a defendant claims that he is not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hunter, 33,066 (La.App.2d Cir.9/27/00), 768 So.2d 687, writ denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1150, writ denied, 2001-2087 (La.4/19/02), 813 So.2d 424; State v. Powell, 27,959 (La.App.2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La.App. 2d Cir.), writ denied, 566 So.2d 983 (La.1990).
Second degree murder is the killing of a human being when the offender either has a specific intent to kill or inflict great bodily harm, or is engaged in the perpetration or attempted perpetration of specifically enumerated crimes, including armed robbery, first degree robbery, and simple robbery, even when the offender has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. Under felony murder, the state must prove the commission of the underlying felony or the attempt thereof. State v. Kirkland, 2001-425 (La.App. 5th Cir.9/25/01), 798 So.2d 263. Unlike first degree murder, no intent to kill or inflict great bodily harm is necessary to be a principal to second decree murder occurring during the course of a robbery. State v. Grant, 623 So.2d 204 (La.App. 2d Cir.), writ denied, 629 So.2d 400 (La.1993).
Robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another by use of force or intimidation, while either armed with a dangerous weapon, believed to be so armed, or unarmed. La. R.S. 14:64; 14:64.1; 14:65.
A person who does not directly commit the act constituting the offense may still be convicted as a principal. State v. Wade, 33,121 (La.App.2d Cir.5/15/00), 758 So.2d 987, rehearing denied, writ denied, 2000-2160 (La.9/28/01), 797 So.2d 684; see also, State v. Stokes, 26,003 (La. App.2d Cir.6/22/94), 639 So.2d 395, writ denied, 94-1880 (La.11/11/94), 644 So.2d 387 (Where defendant sought out victim, went through victim's pockets after victim was shot, defendant made no effort to stop or prevent any further shooting, and defendant actually shared in contraband taken from victim). All persons who are "concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly counsel or procure another to commit the crime are principals." La. R.S. 14:24; State v. Debrow, 35,700 (La. App.2d Cir.2/27/02), 810 So.2d 1197. An individual may only be convicted as a principal for those crimes which he personally has the requisite mental state. State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78; State v. Brooks, 505 So.2d 714 (La. *664 1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
The state may prove a defendant guilty by showing that he served as a principal to the crime by aiding another. La. R.S. 14:24; State v. Smith, 513 So.2d 438 (La.App. 2d Cir.1987). Under this theory, the defendant need not actually take anything to be found guilty of the crime. A person, who aids and abets another in a crime, is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
Mere presence at the scene does not make one a principal to the crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427; State v. Kirkland, supra. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed. State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223; State v. Kirkland, supra. Further, it is of no consequence that Logan was not identified as the shooter. When acting in concert, each man becomes responsible not only for his own act, but for the acts of the other. State v. Anderson, supra.
Logan's argument that no one testified that he and Williams had a conversation immediately before the incident is without merit. Calandria stated that she saw defendant and Williams talking prior to the shooting, but could not hear what they were saying. This conversation took place at the same time that some object was transferred from Logan to Williams.[2]
Evidence was introduced which proved Logan took the green money bag from the victim's car and was later seen dividing the money with Christopher Moore. Also, Nathan testified he received $10 of the money taken from the victim. Logan likewise stole pizza from the victim's car. His mother, Jefferson, testified that when Logan arrived home, he was wearing a grey sweater and was carrying pizza. The evidence clearly supports the conclusion that Logan took valuable property which was in the immediate control of the victim.
Overall, the circumstantial evidence proves that Logan apparently provided the shooter with the gun used to kill the victim, he conversed with the gunman immediately prior to the killing, and he participated in hiding the gun after the killing. Although defendant did not actually pull the trigger and fire the bullet that killed the victim, the evidence clearly proves he was a willing participant in the murder. Logan's and Williams' acts are linked together, making defendant a principal in the murder of Jarvis Griffin. Additionally, the evidence undoubtedly proves that Logan engaged in the perpetration of a robbery during the murder. Last, Logan did nothing to prevent the crime, and he fled the scene rather than assist Griffin.
The state met its burden of negating any reasonable probability of misidentification. Multiple witnesses, who knew Logan prior to the crime, testified regarding his actions with Williams and the victim. After a thorough review of the record, the evidence is also sufficient to meet the standard required by Jackson. Based on the evidence presented at trial, any rational trier-of-fact could reasonably *665 conclude that Logan was guilty of second degree murder beyond a reasonable doubt.

Witnesses' Prior Inconsistent Testimony
In connection with his sufficiency argument, Logan asserts in a pro se argument that the state improperly used impeachment evidence in violation of State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065, and that the evidence deprived him of a fair trial. Logan claims the state improperly used inconsistent statements made by Calandria, and used Detective Kevin Strickland's testimony to impeach Calandria's testimony. Defendant also complains about the state's use of Nathan's prior testimony to impeach his trial court statements. Logan further claims the state misled the jury through its questioning of the witnesses. He states that authorities improperly provided information to Calandria, and that proof exists that information was "beaten into" witnesses.
During Calandria's testimony, the state asked her about the events immediately before the shooting. Calandria stated that when Logan went outside, he went over to Williams. The two were talking, but Calandria could not hear their conversation. Calandria saw Logan's hand go up under his shirt. The testimony reveals:
QThen what did he [defendant] do?
AI thought he took somethingwell, I couldn't see what it was, but I saw his hand come from under his shirt.
* * *
QOkay. And what did he [defendant] hand to him [Williams]?
AI'm not sure. I thought it was a gun. I wasn't sure.
QYou thought it was a gun. Have you been sure in the past?
ANo.
QHave you testified so under oath on two occasions in the past?
AYes.
QAnd, at the time that you testified two times previously under oath that he handed him a gun, were you sure at that time?
ANo, sir.
Next, without objection from defense counsel, the assistant district attorney ("ADA") reminded Calandria of the oath she took to tell the truth. Calandria indicated that she recalled telling an officer that she "thought" she saw a gun. The ADA then referred Calandria to her testimony from Williams' trial. Calandria read:
When Gabriel Logan went outside, what did he do? He went up under my arm and came from under his shirt with a gun and gave it to Corey [Williams].
When confronted with the inconsistency, Calandria claimed that at Williams' trial, she was "simply reciting what was given to me to say." The following exchange then occurred:
QGiven to you to say by who?
AThe papers that you gave me with my information on it.
QOkay.
AI was told to follow those instructions, and it's important that I get on the stand and say exactly what's on them papers. And that's what I did.
* * *
QUnder oath?
AUnder oath.
Upon further questioning, Calandria recalled testifying before the grand jury. She admitted that she had not even met the ADA at the time of the grand jury *666 hearing: "I had a doubt in my mind the first night it happened. I told the police officers that also.... I thought I saw a gun.... I can't say what it was. It was dark."
Q Okay. And you're sitting here today saying you think it was a gun?
AI think. I can't say for sure.
QDo you remember giving a statement in front of Mr. Don Ashley that you saw Gabriel Logan go up under his shirt and get a gun and hand it to Corey Williams?
AYes, I did. I was 17 at the time. I stuck to the same story that I said at the night of the incident because of the severities (sic) of the case.
The state later asked Calandria if she saw Logan steal anything from the car. At first, Calandria said no. Then, without objection from the defense, the ADA asked her to read her response from her previous testimony: "... did he [defendant] come out with anything? He had something in his hand. Like I said, it was dark so I'm not sure about what it was."
Upon the jury's return to the courtroom following a lunch break, the trial court gave the following instruction, at the urging of both counsel:
One of the things that I have been requested to do before we have our next witness is to read to you the instruction that I am going to be giving you again at the conclusion of the case, but it pertains or may pertain to the last witness. In evaluating the testimony of any witness, if you find that such witness has given a prior inconsistent statement, the content of the prior statement cannot be considered as evidence of guilt or innocence in the case. A prior inconsistent statement of a witness can only be used by you to determine what weight to give the original testimony of the witness. The question of whether a witness has given a prior inconsistent statement and the weight to give the testimony of any witness are issues for you to decide.
After the court's instruction, the state ended its questioning of Calandria. The defense did not cross-examine Calandria.
Additionally, Officer Kevin Strickland testified that he interviewed Calandria on the night of the murder, approximately five to ten minutes after his arrival on the scene. Calandria stated to the officer that she observed Logan give Williams a gun. Also, Calandria stated that after the shooting, Logan ran to the car, pulled the driver out, patted the victim's pockets, went into the car, and emerged from the vehicle with a pizza. Sergeant Gryder likewise testified that Calandria stated that defendant gave Williams a gun when she was interrogated at the station after the incident.
Also during trial, Nathan stated that he observed Logan near the victim, but that he did not see Logan pull the victim out of the car or take anything from the car. He stated, "I don't know if he was trying to help the man, or what, but I seen him with the man." The State then confronted him with his prior testimony given during the grand jury proceedings and Williams' trial. Nathan previously testified that he saw Logan pull the victim out of the car, and that Logan got into the car and emerged with a green money bag. After Nathan's testimony, the trial court, without request from defense counsel, again instructed the jury regarding prior inconsistent statements.
Before a witness's credibility may be attacked, La. C.E. art. 613 requires that the witness's attention be called to the inconsistency and the witness be given the opportunity to acknowledge the prior statement. State v. King, 96-1303, (La. App. 3d Cir.4/2/97), 692 So.2d 1296; State *667 v. Dubroc, 99-730 (La.App. 3d Cir.12/15/99), 755 So.2d 297. Failure to recall a statement constitutes a failure to distinctly admit having made it. State v. Stanfield, 562 So.2d 969 (La.App. 3d Cir.), writ denied, 567 So.2d 609 (La.1990); State v. Dubroc, supra.
A statement, "other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted," is hearsay. La. C.E. art. 801(C). Generally, such out-of-court statements are inadmissible. La. C.E. art. 802.
Nevertheless, as noted in State v. Cousin, supra, La. C.E. art. 607(D)(2) permits the introduction of a prior inconsistent statement, even though it is hearsay, for the limited purpose of attacking the credibility of a witness. Although such evidence is admissible for impeachment, the Louisiana Supreme Court has steadfastly recognized that "when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt." State v. Ray, 259 La. 105, 249 So.2d 540, 542 (1971).
The purpose of impeachment is to diminish the credibility of a witness. When the testimony of a witness in court is inconsistent with a prior statement by the witness, the party calling the witness may be able to use the prior statement to impeach the witnessthat is, to diminish his or her credibility. State v. Cousin, supra. The right to use the prior statement depends upon the probative value of the statement as to the credibility of the witness's in-court testimony, as measured against the prejudicial impact that potentially may result from the jury's improper use of the evidence. State v. Cousin, supra, citing Glen Weissenberger, Federal Rules of Evidence: Rules, Legislative History, Commentary and Authority, § 607.3 (1996). The court should consider the prejudicial effect of the statement if used improperly as substantive evidence, and the effectiveness of a limiting instruction in avoiding improper use of the statement. Id.
The Louisiana Supreme Court in State v. Cousin, supra, further reasoned:
One purpose of allowing impeachment by a prior inconsistent statement is to prevent a party from being damaged by the party's own witness. Thus if a witness testifies at trial that he or she saw the accused in another state at the time of the crime, the prosecutor can offset the damage of that testimony by impeaching the witness with a prior statement by the witness of his or her presence in the vicinity of the crime at the time of the crime. This is appropriate use of a prior inconsistent statement to impeach a witness regarding the substance of the witness's in-court testimony that damaged the prosecutor's case. However, a statement by a witness that merely denies making a prior statement which incriminated the accused does not, by the substance of the in-court testimony, damage the prosecutor's case (although "damage," of course, is suffered by the loss of favorable evidence). Indeed, there is nothing of substance in such a denial for the prosecutor to impeach. The denial itself is non-evidence, and it is unnecessary to attack the credibility of non-evidence. The only purpose in using a prior inconsistent statement to attack such a denial is to expose to the jury inculpatory evidence that is substantively inadmissable.
Id. at 1071.
Calandria's testimony shows that while she admitted seeing what she thought was *668 a gun, she was not certain that the object was a gun. Her equivocation did not damage the prosecution's case. Likewise, while Calandria testified that she saw Logan go through the victim's back pockets as he lay dying on the ground, she would not admit that she saw Logan take something from the victim. The ambiguity of that testimony concerning her observance in the darkness of the evening would appear more helpful than damaging to the prosecution. The same can be said regarding Nathan's testimony, since he did not state that he recalled seeing Logan do anything specific with regard to the victim. While it can be inferred from Nathan's testimony that Logan did not steal from the victim, an equal inference is that Nathan simply was not watching Logan's actions closely at the time.
Based upon this analysis, we find that the ruling in Cousin was violated at least regarding Calandria's prior inconsistent statements, and that the impeachment necessity for Nathan's testimony was minimal to prevent damage to the State's case. Nevertheless, unlike the Cousin case, these prior inconsistent statements of Calandria and Nathan were presented by the State without objection. A new basis for an objection cannot be raised for the first time on appeal. State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920, 924 (La.App. 2d Cir.), writ denied, 505 So.2d 1139 (La.1987); State v. Musgrove, 33,977 (La.App.2d Cir.2/15/00), 774 So.2d 1155; La.C.Cr.P. art. 841. No contemporaneous objections were made for these alleged errors during trial. La. C.Cr.P. art. 841. A contemporaneous objection is necessary to preserve an error for appellate review. State v. Richardson, 33,272 (La.App.2d Cir.11/1/00), 779 So.2d 771.
Moreover, we find that the use of the prior inconsistent statements was harmless error given the overall testimony. La. C.Cr.P. art. 921; see also, State v. Refuge, 270 So.2d 842 (La.1972); State v. Harris, 33,406 (La.App.2d Cir.8/25/00), 765 So.2d 1230, writ denied, 2000-2868 (La.8/24/01), 795 So.2d 322. Calandria freely admitted that she thought she saw a gun. Other witnesses testified of an exchange between Logan and Williams, and other testimony reveals Logan's connection to a .25 caliber gun before and after the murder. The circumstantial evidence of Logan's providing Williams the gun and his aid in the commission of the crime as discussed above, was sufficient for the conviction, whether or not the gun was clearly identified at the time of the exchange between the two men. Likewise, various other witnesses discussed Logan's actions in entering the automobile and stealing from the victim. The evidence of Calandria's and Nathan's prior inconsistent statements concerning Logan's actions with the victim and the victim's possessions was cumulative, and therefore the introduction of those statements was harmless error.
In the defendant's supplemental pro se brief, he further alleges that authorities provided information to Calandria, and proof exists that information was "beaten into" witnesses. Other than the testimony of Calandria quoted above, which the jury could consider, the defendant offered no evidence to support either of these claims. Therefore, Logan's pro se assignments have no merit.

Sufficiency of the Grand Jury Indictment
Logan next asserts that the original indictment charging him with first degree murder does not contain a "true bill," nor was it signed by a grand jury foreman. He claims the prosecutor amended the indictment from first degree murder to second *669 degree murder without resubmitting the case to the grand jury, and again failed to maintain a "true bill" signed by a grand jury foreman.
A review of the record reveals that on February 11, 1998, a Caddo Parish grand jury returned a true bill, thereby indicting Logan for first degree murder, a violation of La. R.S. 14:30. The indictment was signed by the district attorney, endorsed as a true bill, and signed by the grand jury foreman. Later, the state charged Logan with second degree murder by amended indictment, which was signed by the district attorney, but not endorsed as a true bill by the grand jury foreman. The record indicates that Logan waived formal arraignment to this amended charge and pled not guilty to the second degree murder charge.
La.C.Cr.P. art. 382(A) provides, in part, that a prosecution of an offense punishable by death or life imprisonment shall be instituted by grand jury indictment. Second degree murder is punishable by life imprisonment. La. R.S. 14:30.1(B). Therefore, Logan's prosecution for second degree murder should have been instituted by a grand jury indictment. However, district attorneys are empowered to amend indictments to charge lesser offenses. State v. Gilmore, 332 So.2d 789 (La.1976). The state may abandon the charge of a greater crime and proceed with prosecution for the lesser crime and no formal indictment is necessary for that purpose. State v. Edwards, 287 So.2d 518 (La.1973). Thus, the district attorney had the power to amend the charge to second degree murder without a formal indictment.
Defendant's pro se brief also maintains that the indictment was defective, because it failed to allege intent, an essential element of first degree murder under La. R.S. 14:30. Logan further declares the indictment failed to specify which of the enumerated offenses were charged in order to constitute first degree murder.
Logan's assertions directed at the original indictment are misplaced, since we have ruled that the amended indictment was proper. Nevertheless, our review of the initial indictment shows that it properly set forth an indictment for first degree murder. The amended indictment charges that Logan committed the offense of second degree murder, "in that he and Corey Williams were engaged in the perpetration and attempted perpetration of the armed robbery, first degree robbery and simple robbery of Jarvis Griffin, which resulted in the killing of Jarvis Griffin even though Gabriel Logan had no specific intent to kill or inflict great bodily harm." Logan's claim that the indictment is defective because it failed to name which enumerated offense he committed is therefore without merit.

Ineffective Assistance of Counsel
Logan complains that both trial and appellate counsel were ineffective in their representation, because they failed to adequately review the indictment. He claims if counsel had properly reviewed the record and the indictment, they would have noticed the lack of a "true bill" and signature of the grand jury foreman. He contends the outcome of his case would have been different if counsel had filed a motion to quash the grand jury indictment.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief than on appeal, since that procedure allows the opportunity for a full evidentiary hearing under La.C.Cr.P. art. 930. State v. Green, 27,652 (La. App.2d Cir.1/24/96), 666 So.2d 1302, writ denied, 97-0504 (La.10/31/97), 703 So.2d *670 14. However, when the record is sufficient, this court may resolve the issue on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La. App.2d Cir.9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Grissom, 624 So.2d 476 (La.App. 2d Cir.1993).
To establish that his attorneys were ineffective, Logan must first show that his counsels' performances were deficient. This requires a showing that counsel made errors so serious that they did not function as the "counsel" guaranteed by the Sixth Amendment. Strickland, supra.
Second, the defendant must show that counsels' deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, in which the result is reliable. Strickland, supra; State v. Grissom, supra.
In light of our prior ruling finding that the indictment was not defective, we hold that Logan has failed to meet his burden of proving that either trial or appellate counsel's representation fell below the standards of reasonableness and competency required for attorneys in criminal cases. Also, defendant has failed to show that either or both counsel's performance prejudiced his defense. As such, Logan's claim of ineffective assistance of counsel is without merit.

Conclusion
For the foregoing reasons, defendant's conviction and sentence are affirmed.
AFFIRMED.
BROWN, J., Concurring,
La.C.E. art. 607D(2) allows a party to impeach his own witness with prior inconsistent statements without a showing of surprise or hostility; however, the evidence can be used solely to impeach the witness's credibility and then only if the probative value is not substantially outweighed by unfair prejudice.
Cousin held:
In the context of a case where the prosecutor calls a witness who gave a prior statement favorable to the prosecutor's case, but has now become a turncoat witness, and the prosecutor offers the favorable statement as a prior inconsistent statement to "impeach" the witness, the court is required to utilize the weighing process of La.Code Evid. art. 607D(2) in determining whether to allow the introduction of the statement at the trial through the testimony of a police officer or other person who received the statement. The evidence in this case should have been excluded under the weighing process of Article 607D(2).[1] (Emphasis added).
In the present case, the jury was instructed by the court in accordance with Art. 607D that the evidence was for impeachment only, and clearly, as stated in the majority opinion, the prejudicial effect was negligible. The real issue presented in this case is that Calandria admitted to making the prior statements. Allowing the officers to testify thereafter as to the *671 content of the statements, however, was harmless error.
NOTES
[1] In his pro se brief to this court, Logan also raised additional issues pertaining to the sufficiency of the evidence. Logan asserts that the gun was at his house, because Williams lived with him. Also, Logan claims that the victim's blood was found on his clothing, because he helped the victim. Logan likewise asserts that he did not go through the victim's pockets as witnesses testified, because police reports indicate the victim's wallet and money were taken by Officer Miles after conducting a search of the victim's person. Defendant alleges there is no evidence of criminal activity on his part, but only his presence at the crime scene. Finally, Logan insists that he does not fit the witnesses' description of the assailant.
[2] In Calandria's prior sworn testimony, addressed below, she indicated that the object transferred to Williams was a gun.
[1] Cousin, supra at 1072.