CARAWAY, J.
liBy amended indictment, LaTroy Gaines was charged with one count of second degree murder in violation of La. R.S. 14:30.1. A jury found Gaines guilty as charged and he received the mandatory sentence of life imprisonment at hard labor without benefit of parole. Gaines now appeals, urging one attorney-filed assignment of error and five pro-se assignments of error all addressing the sufficiency of the evidence to convict. We affirm.

Facts

On the night of December 29, 2004, the Bienville Parish Sheriffs Office (“BPSO”) and the Arcadia Police Department (“APD”) received reports of a shooting and a car accident at the carwash adjacent to the Fastpak store in Arcadia, Louisiana. APD Officer Gary White responded to the call and observed a blue Chevy sedan pull out of the parking lot. When several bystanders directed the officer to stop the car, Officer White pursued the vehicle. White was no more than forty-five or fifty yards behind the vehicle when he began pursuing it and never lost sight of the vehicle until he pulled it over. White never saw anything come out of the car windows during the pursuit.
Meanwhile, BPSO Deputy John Crawford arrived at the scene and found a gold 1970 Oldsmobile Ninety Eight convertible in the woods beside the car wash. The car was on fire, and Deputy Crawford saw that it was occupied by an unresponsive man. The deputy and two other men pulled the occupant from the burning car. Just after they did so, the car’s gas tank |2ruptured and the car was engulfed in flames. The occupant of the car was Anthony Pruitt. He had been shot to death.
Officer White was able to stop the Chevy and he put the driver, Michael Ger-maine Harris, in the back seat of the patrol car while White and another responding officer searched the vehicle. White found three unspent .410 bore shotshells, loaded with No. 6 shot, on the front pas *229 senger floorboard. He also found a black case in the rear driver’s side floorboard that held seventeen live .30 Carbine cartridges. The officers did not find any weapons in the Chevy.
The local volunteer fire department arrived at the carwash and put out the auto fire. One of the firefighters, Chad Wright, found a pump-action Mossberg .410 shotgun behind the carwash. The gun was loaded with only one shell in the chamber which was of the same brand and type (No. 6 shot) as those found in the Chevy. Other officers recovered two spent .30 Carbine cartridge cases from the area behind the car wash; these spent cases had the same headstamp as the live rounds found in the Chevy. Early the next morning, a deputy searching around the car wash found a trash bag containing six pounds of marijuana.
Police arrested Harris for the murder of Pruitt. Early the next morning, Harris gave police the first of three statements he would make implicating himself, Christopher Winzer and the defendant, LaTroy Gaines, in Pruitt’s death. Winzer was arrested later on December 30, and he also gave police a statement implicating himself, Harris and Gaines. Police arrested Gaines on January 5, 2005, when Gaines turned himself in.
| ^Because of the textures and conditions of the items of evidence recovered, police did not attempt to recover fingerprints to compare with those of the suspects. Further, police did not recover a .30 Carbine weapon despite two searches of a pond conducted after receiving a tip from an informant.
Police were able to find witnesses to some of the events on the evening of the murder. Mr. Robert Cockerham, Jr., was visiting a group of friends near the Fast-pak when he heard a loud “boom” that sounded like a gunshot. Cockerham believed he was shot until he saw Pruitt’s Oldsmobile come out of one of the car wash bays. Cockerham saw Pruitt crash into Harris’s blue Chevy before driving the Olds into the woods. Police found fresh damage to the left front of the Chevy. Cockerham said that Michael Harris, whom he knew by his middle name Ger-maine, was driving the Chevy, but he did not see who fired the gun. Cockerham said that he did not see the defendant at the scene.
Another bystander, Jimmy Perry, was at the Fastpak when he heard two gunshots. As he ran to his cousin’s car to flee the scene, he saw the victim’s Oldsmobile pulling out. He also saw the police stop Harris. Perry knew both Winzer and Gaines but said that he did not see either man at the scene of the shooting. Perry’s cousin, Antonio Harris, said that he had spoken to Michael Harris, his first cousin, at the carwash before the shooting. Antonio Harris also knew Winzer and Gaines but did not see either man there that night. He said that he heard “four or five” shots and then saw the victim’s car pull out from the car wash, hit Michael Harris’s 1 ¿car and then go into the woods. He also saw Michael Harris leaving the car wash and being stopped by police. Another witness, Chad Tawwaters, saw the blue Chevy leaving the scene after the incident; Tawwaters was one of the men who pulled the victim from his burning car.
Lisa Hayes, the deputy coroner for the facility which performed the autopsy, said that four bullet fragments and one bullet jacket fragment were recovered from the victim’s body during the autopsy; she distinguished these bullet fragments from shotgun pellets. The autopsy report identified by Hayes and submitted into evidence listed Pruitt’s cause of death as multiple gunshot wounds. Hayes took photos of the victim’s body that were admitted *230 into evidence. Deputy Owen McDonnell, with the Crime Scene Investigation Division of the Caddo Parish Sheriffs Office, examined the shotgun and was able to match a palm impression on the shotgun to Mr. Winzer’s hand.
A grand jury indicted Gaines, Harris and Winzer for the first degree murder of Pruitt. Both Harris and Winzer accepted plea agreements to manslaughter in exchange for their truthful testimony at Gaines’s trial, and the state later amended the charge against Gaines to second degree murder.
At trial, Harris testified that he and Winzer spent the afternoon of December 29, 2004, together at Harris’s home south of Arcadia. The two men left in Harris’s car and went driving around Arcadia when they met the defendant in town. Harris testified:
Well, we were going to ... go get some weed, so he just asked-well, I asked him if he had a gun, and he was like— couldn’t nobody see his baby, so, he was like “But I’ll ride with you.”
|5Harris and Winzer went back to Harris’s house, and Winzer went back to his home. Later, Harris drove to Winzer’s house to pick him up, and Winzer came to the car carrying the .410 bore shotgun that was later found in the woods behind the car wash. Harris called Gaines and asked him if he was going to “ride with” the men; Harris explained that the men had talked about robbing Pruitt, also known to them as “Red.” Harris said that the defendant wanted to go with them, so Harris and Winzer drove back to pick up Gaines. Harris testified he was driving, Winzer was in the front passenger’s seat and the defendant was in the back seat on the driver’s side.
Harris explained that Gaines instructed him to drive to a nearby street, which Harris did. Gaines told Harris to stop and then got out of the car and was gone for about a minute; when he returned, the defendant was carrying what Harris called an “AK” and an “assault rifle.” Gaines got back into Harris’s car in the rear seat behind the driver.
The men tried to meet the victim at an apartment complex, but Harris said that the victim, who believed that he was going to sell the men some marijuana, did not want to meet at that location because the complex had surveillance cameras. Ultimately, the victim told the men to meet him at the car wash.
Hams explained that he drove to the car wash, dropped Winzer off behind the Fastpak and Gaines at the car wash. Gaines went into the woods. Harris parked and waited for the victim to arrive. When Pruitt pulled in, Harris got into the passenger side of the victim’s car. When the victim pulled out the bag full of marijuana, Winzer and the defendant came out of | fihiding, ran up to the victim’s car and pointed their guns at the victim, with Win-zer saying “Give it up, give it up.” The victim grabbed the barrel of the Gaines’s rifle and began to fight with the defendant for control of the weapon. Harris testified that he jumped out of the victim’s car and ran away. As he ran, Harris turned around and saw Gaines firing the rifle.
Harris reached his car and began to drive away, but explained that he jumped out of his car in a panic when he saw the victim’s car pulling out from the car wash bay. Harris took the drugs and threw the bag into the woods behind the car wash, and then went back to his car and left the scene only to be stopped by police shortly thereafter.
On cross-examination, Harris admitted he lied to police in his first statement to them. Specifically, he admitted that he told police that Winzer did not have a *231 weapon, and then that he told them that Winzer had a pistol. He also admitted he lied when he initially told police the victim had never had any problems with Winzer but that the victim had once pulled a gun on Gaines. Harris also initially told police that he did not know whether Winzer or the defendant fired a weapon at the victim. Harris also initially lied about the amount of marijuana involved and about whether he saw either Winzer or Gaines with a weapon; however, in his second and third statements, he told police that he was involved with the robbery and that the defendant was the shooter. Harris testified that his testimony was given in exchange for a guilty plea to manslaughter with an agreed-upon 15-year sentence, and the jury was made well aware of Harris’s potential motives for lying.
|7Christopher Winzer also testified as a result of a plea agreement identical to that of Harris. Winzer related the facts much as Harris had done. He testified that the men picked up Gaines in Arcadia and that the defendant retrieved a “short rifle” after they picked him up. Winzer said the defendant hid at the car wash and waited with Winzer, who was wearing a ski mask, for the victim to arrive. When Harris got in the car with the victim, Winzer and the defendant went toward the car to steal the drugs. Winzer said that he saw the defendant put his gun up to the window on the victim’s car, and after a few words were said, Winzer testified that the defendant fired his weapon. Winzer said that he did not expect the victim to be shot, so he ran from the scene, dropping his shotgun in the woods as he fled.
On cross-examination, Winzer admitted that he did not initially tell police that Gaines shot the victim. Winzer only said that he and Harris did not shoot the victim. He also admitted that the men lied to the victim in order to get the victim to come to Arcadia with a quantity of marijuana. As was the case with Harris, the jury heard a thorough exploration of the varied reasons why Winzer might be lying in his testimony.
The state completed its case with Win-zer’s testimony. The defendant called one witness, Victor Gipson. Gipson, an acquaintance of Gaines testified that he was present when the shooting occurred and witnessed the shooting. He explained that he was sitting in a car at the car wash when he saw a man wearing a grey sweatshirt and a grey ski mask walk up to the victim and fire two times. He said that only one person did the shooting, |sand that the shooter could not have been Gaines because the shooter was taller than the defendant. The witness described the murder weapon as a shotgun, saying that he saw the shooter rack the slide after shooting the first time. Gipson admitted he had never come forward to tell the police or the district attorney what he had seen and that Gaines’s mother drove him to see the defendant’s attorney so he could tell what he had seen.
Gaines elected not to testify. The jury found him guilty of second degree murder. The court sentenced Gaines to the mandatory term of life imprisonment at hard labor without parole. This appeal ensued.

Discussion

Appellate counsel in brief and Gaines in pro se arguments argue that the evidence was insufficient to support Gaines’s conviction. Specifically, Gaines argues that the state presented no incriminating evidence that would suggest that he was involved in the crime. He also argues that Winzer’s and Harris’s testimony should not be believed due to inconsistencies in their statements and the benefits they received as the result of plea bargains. He contends that no evidence other than these co-perpetrators’ testimony connects him with *232 a .30 caliber gun and that he has never confessed guilt to the crime.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219, writ denied, 06-1083 (La.11/9/06), 941 So.2d 35.
Louisiana law allows an accomplice to testify against a co-perpetrator even if the state offers inducements to testify. Such inducements are a factor in evaluating the witness’s credibility. State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047, cert. denied, 549 U.S. 1353, 127 S.Ct. 2065, 167 L.Ed.2d 789 (2007); State v. Neal, 00-0674 (La.06/29/01), 796 So.2d 649, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). A conviction may be sustained by the uncorroborated testimony of an accomplice, although the jury should be instructed to treat the testimony with caution. State v. Hughes, supra; State v. Tate, supra.
The law of principals is found in La. R.S. 14:24 which provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Under Louisiana law, a person may be convicted of intentional murder even if he has not personally struck the fatal blows. State v. Wright, 01-0322 (La.12/4/02), 834 So.2d 974; State v. Mitchell, 39,305 (La.App. 2d Cir.2/17/05), 894 So.2d 1240, writ denied 05-0741 (La.6/3/05), 903 So.2d 457. Only those persons, however, who knowingly participate in the planning or execution of a crime are principals. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427; State v. Mitchell, supra. Mere presence at the scene is not enough to “concern” an individual in a crime. Id. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed. State v. Logan, 36,042 (La.App. 2d Cir.6/14/02), 822 So.2d 657, writ denied 02-2174 (La.9/19/03), 853 So.2d 621.
*233 This is a case where no bystander witness saw the shooting or identified three perpetrators of the crime. We acknowledge that Gaines’s conviction rests primarily on the testimony of his two accomplices, both of |nwhom were directly linked to the crime site. While a conviction may be sustained by the uncorroborated testimony of one accomplice, there is an important element of corroboration that resulted in this case because of the initial confessions of the two accomplices. On the day after the crime with Harris in custody, he first implicated Gaines when no other bystander near the crime site or other evidentiary source revealed to the investigation the participation of Gaines. Later that day, Winzer was arrested, and he too named Gaines a participant in the crime. There is no evidence shown or argument made that each party’s naming of Gaines was anything but totally independent of the other party’s very similar report. The naming of Gaines was not a remarkable coincidence with the two accomplices randomly choosing the name of a third party and closely detailing his role in the crime. The independence and details of the two confessions provide significant corroboration of the testimony of the accomplices.
Moreover, there is circumstantial evidence tending to show that the two guns physically linked to the crime were not in the control of Harris and were probably utilized by two other accomplices. The .30 Carbine rifle was not in Harris’s vehicle or discarded by him as he fled the scene. The other shotgun had Winzer’s print.
Finally, we note that the accomplices’ testimony of the identity of the actual trig-german in the murder was not essential to Gaines’s conviction as a principal to the second degree murder. Thus, any weakness in the evidence corroborating that specific fact does not make the evidence as a whole insufficient to support the conviction.
112Indeed, all of the details of the testimony raised by the defendant in his assignments of error were presented to the jury for their consideration, and it is not this court’s role to reweigh the evidence. Ultimately, the accomplices’ testimony was not contradicted by the physical evidence. Thus, when viewed in the light most favorable to the state, we find the evidence presented by the state in support of Gaines’s conviction, sufficient to support the jury verdict.

Conclusion

For the foregoing reasons, Gaines’s conviction and sentence are affirmed.
AFFIRMED.