Judgment rendered February 25, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,745-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                        Appellee

Versus

DONOVAN EUGENE PHILLIPS                    Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 378,924

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPEALS AND                    Counsel for Appellant
WRIT SERVICE
By: Remy V. Starns
    Michael Anthony Mitchell
    Mary E. Roper

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

VICTORIA T. WASHINGTON
ERIC M. WHITEHEAD
Assistant District Attorneys

* * * * *

Before STONE, STEPHENS, and THOMPSON, JJ.

**STEPHENS, J.,**

This criminal appeal arises out of the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Chris Victory, Judge, presiding.  The defendant, Donovan Eugene Phillips, was charged by bill of indictment with the first degree rape of E.C. (d.o.b. 12/22/2007), in violation of La. R.S. 14:42(A)(4).[1]  Following trial held on April 7-9, 2025, the 12-person jury found Phillips guilty as charged, and on April 15, 2025, he was sentenced by the trial court to life imprisonment without the benefit of probation, parole, or suspension of sentence.  Phillips has appealed, urging one assignment of error.  For the reasons set forth below, his conviction and sentence are affirmed.

## FACTS AND PROCEDURAL HISTORY

In September 2020, Deputy Jack Anderson with the Caddo Parish Sheriff's Office ("CPSO") spoke with Ilenna Austin Phillips ("Ms. Austin"), who reported that her 12-year-old daughter E.C. had been sexually abused by her former stepfather/Ms. Austin's ex-husband, Donovan Phillips.  Dy. Anderson got in touch with Ray Saunders, CPSO's on-call youth services detective, who took lead on the case and arranged for E.C. to be interviewed at the Gingerbread House.

Forensic interviewer Meaghan Hughes spoke with E.C. on September 21, 2020, at the Gingerbread House; portions of the recorded interview, which was properly authenticated and admitted into evidence as State's Exhibit No. 1, were shown to the jury at Phillips' trial during E.C.'s

---

[1] La. R.S. 14:42(A)(4) provides that first degree rape is a rape committed upon a person where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of thirteen years.  Lack of the victim's age shall not be a defense.

testimony.[2] E.C. related to Ms. Hughes that Phillips had been sexually touching her since she was seven or eight years old, and he had shown her pornography on his phone—specifically, videos depicting sexual intercourse. E.C. told Ms. Hughes that when she was ten years old, Phillips took her virginity when he had painful vaginal intercourse with her. E.C. related that once she began having her period, which was around February 2020, Phillips would use a condom during intercourse. She specifically recalled that the condoms were a brand called "SKYN" that came in a black box. Phillips would keep the condoms in a brown backpack on the shelves in his bedroom. E.C. testified that the kids (she and her three brothers) were not allowed in Phillips' room unless they were told to go in there. According to E.C., a condom broke once during intercourse, and Phillips went to the store to purchase a "Plan B" pill which he gave her to take.

E.C. testified that Phillips would routinely force her to perform oral sex or engage in vaginal intercourse when her mother left the house. These acts would take place in his locked bedroom or in the living room when no one was home. However, on one occasion, Phillips performed oral sex on E.C. while she was asleep in the living room and her mother was asleep in the bedroom. Another time he made her have sex back in the woods behind the tree the deer "cam" was strapped to. E.C. further stated that Phillips would make her do chores, threaten her with physical harm, withhold certain privileges, or yell at her if she refused to have sex with him.

---

[2] We note that the trial court cleared the audience out of the courtroom for E.C.'s testimony pursuant to a motion made by the State, allegedly under the auspices of Louisiana's statute protecting the rights of victims of crimes. We do not read this provision as expansively. Instead, La. R.S. 46:1844 must be considered in light of La. Const. art. I, § 22 (Access to Courts), and art. I, § 16 (a Defendant's Right to a Fair Trial).

Ms. Austin testified that she and Phillips were married for about eight years. Prior to their marriage, Ms. Austin had three children—two sons and a daughter, E.C., and together, Ms. Austin and Phillips had one son, A.P. Ms. Phillips stated that her marriage was "basically" over when she moved out of his house into a rent house on August 1, 2019. She explained that she first learned of the abuse when a friend's daughter forwarded to her screenshots of messages E.C. sent to her and others in a group chat in which E.C. expressed that she wanted to kill herself. When Ms. Austin spoke to her daughter about the messages, E.C. was crying and distraught. E.C. told her mother about the sexual abuse Phillips had subjected her to, which had occurred from around 2017 through September 2020.[3]

According to Ms. Austin, Phillips lost his job sometime in 2015. From 2015 to 2019 he did not maintain a job, although he had occasional work. As a result, the nature of their relationship changed during that time period. Ms. Austin characterized Phillips as distant and more verbally and physically abusive, as well as avoidant. It was during that time that Phillips decided that he didn't want her to sleep in the same bed as him, so she went and slept on the couch. According to Ms. Austin, she slept on the couch for about two years. She then moved to A.P.'s bedroom, which is where she was staying when she moved out.

Ms. Austin testified that her and Phillips' sexual relationship ended somewhere around 2015 or 2016. They were not having sex when she moved to the couch. Before that time, they had sex "constant, all the time," multiple times a day. Ms. Austin stated that when that changed, she had a

_____

[3] Although Ms. Austin and Phillips separated in 2019, Phillips still had visitation with the children, including E.C., until the abuse was reported.

feeling that something was going on. "I knew he was cheating on me, but I really, honestly had no clue that it was my daughter (sobbing)."

Immediately after her conversation with E.C., Ms. Austin called her brother, a Louisiana State trooper, to ask his advice on how to proceed. He told her to hang up immediately and contact local law enforcement, which she did. CPSO deputies came out and took her statement then made arrangements to have E.C. interviewed at the Gingerbread House.

Ms. Austin then testified that she is just now realizing that the relationship Phillips had with E.C. was "too close to be a father-daughter thing." Examples given by Ms. Austin included that Phillips let E.C. walk around in his t-shirt and panties and gave her better treatment than the boys. According to Ms. Austin, when she and Phillips had sex, they did not use condoms because she was allergic to latex. Further, she did not keep Plan B emergency contraceptive pills in the house.

On cross-examination, Ms. Austin conceded that the allegations against Phillips came out when they were in the middle of their divorce but that the two were unrelated. She also acknowledged that she and Phillips were difficult with each other during their divorce, but vehemently denied instructing her children to lie to Phillips about her new boyfriend. On redirect, Ms. Austin testified that because Phillips was unemployed, she was the breadwinner during their relationship. She was employed cleaning houses from 2015 "till now." During the relationship, she would put the kids on the bus and work until 5:00-6:00 p.m. There was no childcare—Phillips kept the children after school. Ms. Austin reiterated that she did not have her daughter make up rape allegations to get custody of her children. She

4

repeated that the oldest three children were hers, and that only A.P. was both hers and Phillips' child.

Det. Saunders testified that he spoke with Ms. Austin and observed the Gingerbread House interview of E.C. on a closed circuit television in another room while wearing earbuds so he could communicate with the interviewer to suggest issues that may need to be addressed. Det. Saunders, in response to questions from the prosecutor, provided details from the Gingerbread interview.

E.C. related that the abuse started when she was seven or eight years old and continued until she was 12 years old. It began with touching and talking and escalated to full-blown sex. E.C. told Ms. Hughes that Phillips showed her pictures and videos and explained to her about boy parts and girl parts, and it proceeded to sex from there. E.C. recalled that Phillips would look on his phone and google "teen cream pie," which was a video he would have her watch.

E.C. also told Ms. Hughes that Phillips made her have vaginal sex and sometimes oral sex with him. She described several instances in detail. E.C. also talked about threats Phillips communicated to her, that he would hurt or kill her, and that if anybody ever found out he would go to jail.

E.C. stated that Phillips used condoms, which she described as SKYN condoms in a black package, until she started menstruating because he didn't want to get her pregnant. Phillips kept the condoms in his backpack in his bedroom. One time during sex a condom broke. According to E.C., afterwards Phillips made her take a bath and a Plan B pill. She also stated that Phillips always showered "after."

Det. Saunders testified that he searched Phillips' house pursuant to a search warrant. He found a brown backpack (State's Exhibit No. 3) near the shelves in Phillips' master bedroom, corroborating information from E.C.'s interview with Ms. Hughes at the Gingerbread House. Inside that backpack were a bottle of lubricant (State's Exhibit No. 4) and a box of SKYN condoms (State's Exhibit No. 5), also corroborative of information provided by E.C. Det. Saunders stated that based on E.C.'s statements regarding the extent of the sexual assaults and her age at the time of the alleged sexual acts, he obtained an arrest warrant for first degree rape for Phillips.

Before Det. Saunders' testimony was concluded, there was an off-the-record sidebar conference between counsel and the court outside of the jury's presence. Once back on the record, defense counsel made a motion for the issuance of an instanter subpoena for A.P., E.C.'s younger brother and the minor child of Phillips and Ms. Austin. According to defense counsel, an instanter subpoena was necessary because A.P.'s testimony would be used to impeach the testimony of Ms. Austin, who had "factually" but not "materially" lied. The trial court denied issuance of the subpoena but told defense counsel if he could get A.P. to court, he was free to testify in the defendant's case in chief. No objection to the trial court's ruling was made.

Following a Fifth Amendment colloquy, Phillips testified in his own defense. Phillips denied ever touching in a sexual manner or having sexual intercourse with E.C. He also stated that E.C. never wore his t-shirts or underwear. According to Phillips, all allegations were concoctions of his ex-wife Illena Austin, with whom he was in the midst of acrimonious and "very expensive" divorce and custody proceedings. Phillips contradicted Ms. Austin's claims that he never wore a condom during intercourse with her or

6

kept condoms in his brown backpack after the birth of their son A.P. He also testified that Ms. Austin kept Plan B pills in their home in the event that a condom broke because she didn't believe in abortion.

The defense rested following Phillips' testimony, choosing not to call any other witnesses. After closing arguments and the trial court's charge to the jury, the 12-person jury voted unanimously to convict Phillips as charged of first degree rape, and the trial court sentenced him to life imprisonment without the benefit of probation, parole, or suspension of sentence.

Phillips has appealed, urging that the trial court's denial of his request for issuance of an instanter subpoena for an impeachment witness was an abuse of its discretion and violated his constitutional right to present a defense.

## DISCUSSION

According to Phillips, the trial court's refusal to issue an instanter subpoena for A.P. was an abuse of its discretion. Phillips claims that he wanted to subpoena his and Ms. Austin's son A.P. as an impeachment witness after Ms. Austin lied on the witness stand. Phillips argues that it was going to be difficult to get A.P. to testify since he was in Ms. Austin's custody, and the child's testimony was being sought to discredit *her*.

The court's authority was needed to facilitate the testimony, urges appellate counsel. Whether the line of defense should have been anticipated is "speculative," argues Phillips, since the defense did not have the ability to hear Ms. Austin's testimony until she was on the witness stand, and impeachment doesn't come into play until a witness has testified. The trial court's refusal to issue an instanter subpoena was an abuse of its discretion and resulted in a denial of Phillips' constitutional right to present a defense,

7

concludes appellate counsel, citing the U.S. Const., Sixth Amendment, and La. Const. art. I, § 16.

On the other hand, the State points this Court to the record, which shows that the defense neither contemporaneously objected to the trial court's ruling nor raised the issue in a post-verdict motion. Because Phillips failed to properly object to the trial court's denial of his motion to issue an instanter subpoena during trial, this assignment of error was not preserved for appellate review, nor is it subject to correction on error patent review.

The State urges that because the defendant failed to properly preserve this error, there is nothing for this Court to review. Thus, this Court should affirm Phillips' conviction and sentence without reviewing his assignment of error.

A contemporaneous objection is necessary to preserve an error for appellate review. La. C. Cr. P. art. 841; *State v. Ford*, 55,482 (La. App. 2 Cir. 7/17/24), 399 So. 3d 61; *State v. Logan*, 36,042 (La. App. 2 Cir. 6/14/02), 822 So. 2d 657, *writ denied*, 02-2174 (La. 9/19/03), 853 So. 2d 621. There are two purposes to the contemporaneous error rule: to put the trial court on notice of the alleged irregularity or error so that the court can cure the error, and to prevent a party from taking a chance on a favorable outcome and then appealing when the outcome is not as hoped and urging an error that easily could have been addressed by an objection. *State v. Santiago*, 23-00501, p. 5 (La. 5/10/24), 384 So. 3d 879, 882; *State v. Lanclos*, 07-0082, p. 6 (La. 4/8/08), 980 So. 2d 643, 648.

The defendant failed to object to the trial court's adverse ruling on his motion for an instanter subpoena; therefore, this assignment of error is not reviewable by this Court. Furthermore, it is only errors that affect the

substantial rights of the accused that are reviewable by the appellate court absent proper objection. *State v. Williamson*, 389 So. 2d 1328 (La. 1980). As noted by the trial court, "[d]efense counsel had an opportunity to subpoena anybody they wanted, and that apparently has not been done[.] This should have been done before. It is an anticipated line of attack. And that being said, if you can get this person here, he's free to testify in this trial, in your case in chief." This assignment of error is without merit.

## CONCLUSION

For the reasons set forth above, the conviction and sentence of the defendant, Donovan Eugene Phillips, are affirmed.

**AFFIRMED.**